**Oliver BROWN, et al., Plaintiffs,**

**and**

**Charles and Kimberly Smith, minor children, by their mother and next friend, Linda Brown Smith, et al., Intervening Plaintiffs,**

**v.**

**BOARD OF EDUCATION OF TOPEKA, SHAWNEE COUNTY, KANSAS, et al., Defendants.**

**No. T–316.**

United States District Court, D. Kansas.

April 9, 1987.

Richard E. Jones, Charles Scott, Jr., Topeka, Kan., Christopher A. Hansen, New York City, for plaintiffs.

Gary Sebelius, Charles McAtee, Topeka, Kan., for defendant USD # 501.

Dan Biles, Overland Park, Kan., Carl Gallagher, Asst. Atty. Gen., Topeka, Kan., for defendant Members of the State Bd. of Educ.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

### I. *Introduction.*

In 1954, the Supreme Court's landmark decision in this case signaled the close of a disgraceful period of *de jure* segregation in schools of Topeka, Kansas and other parts of the nation. This case has returned to this court for a trial to determine whether the vestiges of *de jure* segregation have been eliminated. The trial was conducted from October 6, 1986 to October 31, 1986. Post-trial briefs were filed in December, 1986. Reply briefs followed on January 28, 1987. The court is now prepared to issue the following findings of fact and conclusions of law.

### II. *History of the Case.*

This case started in 1951 as a class action challenging a state statute which gave the defendant Board of Education of Topeka, Shawnee County, the power to organize separate schools for black and white elementary students, grades one through six. At that time, there were eighteen white elementary schools and four black elementary schools. White students were assigned to the schools on the basis of neighborhood districts. No transportation was afforded white students. Transportation to the black schools was provided by the Board of Education. Students could attend the black school of their choice. In practical effect, one of the original plaintiffs, Oliver Brown, was suing for the right to have his daughter, Linda, attend a neighborhood white school instead of taking a bus to a black school.

The State of Kansas intervened in the trial to defend the constitutionality of the state legislation authorizing elementary school segregation at the option of school boards in cities of the first class. The trial court, on August 3, 1951, refused to "substitute our own views for the declared law by the Supreme Court" and upheld the constitutionality of state-authorized segregation in Topeka's public elementary schools. 98 F.Supp. 797, 798.

The Supreme Court accepted the trial court's finding that the physical facilities of white and black schools in Topeka and other "tangible" factors were equal, but concluded that "in the field of public education the doctrine of 'separate but equal' has no place." 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954). This finding was based on the conclusion that separating children "from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." 347 U.S. at 494, 74 S.Ct. at 691.

At the close of the Court's opinion, reargument was ordered on the question of relief. One year later, in May 1955, the Court noted that "substantial progress" in the elimination of racial discrimination in public schools had been made in Kansas. 349 U.S. 294, 299, 75 S.Ct. 753, 755, 99 L.Ed. 1083. The case was then remanded to the U.S. District Court of Kansas to fashion and effectuate such an equitable decree as was "necessary and proper to admit to public schools on a racially nondiscriminatory basis with all deliberate speed the parties to these cases." 349 U.S. at 301, 75 S.Ct. at 757. The Court noted that: "Traditionally, equity had been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." 349 U.S. at 300, 75 S.Ct. at 756.

Following the remand of this case from the Supreme Court, the district court considered a remedial decree submitted by the Board of Education. The "central principle" of the decree, as described by the district court, was that children, regardless of color, would attend the school in the district of their residence. 139 F.Supp. 468, 469 (S.D.Kan.1955). Addressing the concern

that some all-black schools remained under the Board's plan, the court stated:

> Desegregation does not mean that there must be intermingling of the races in all school districts. It means only that they may not be prevented from intermingling or going to school together because of race or color.
>
> If it is a fact, as we understand it is, with respect to Buchanan School that the district is inhabited entirely by colored students, no violation of any constitutional right results because they are compelled to attend the school in the district in which they live.
>
> It is the conclusion of the court that while complete desegregation has not been accomplished in the Topeka School System, a good faith effort toward that end has been made and that, therefore, the plan adopted by the Board of Education of the City of Topeka be approved as a good faith beginning to bring about complete desegregation.

139 F.Supp. at 470.

No appeal was taken from the district court's order. This case remained inactive until 1979 when a new group of parents with school children in Topeka's public schools were permitted to intervene. The new plaintiffs charge that the mandate to desegregate Topeka's schools has never been completed. After a long process of discovery and the consideration of pretrial motions, the trial of this case was accomplished.

### III. *The Parties.*

The new named plaintiffs in this case are a group of parents with black children attending various schools in Unified School District # 501. In place of the Board of Education of Topeka, Shawnee County, Kansas, Unified School District (U.S.D.) # 501 has been named a defendant. In 1965, by a state statute unifying school districts across Kansas, U.S.D. # 501 was designated as the successor to Topeka Public Schools No. 23, the district served by the original defendant Board of Education. U.S.D. # 501 includes public schools in the same area concerned in the original complaint plus substantial additional territory annexed by the City of Topeka since this case was filed. Prior to the creation of U.S.D. # 501, the boundaries of Topeka Public Schools No. 23 grew with the city limits of Topeka. The boundaries of U.S.D. # 501 and the city limits are no longer coterminous. There are three other school districts in areas outlying Topeka, Kansas. These districts are not parties to this action.

The State Board of Education (SBE) is a party defendant in this case. It was created by state constitutional amendment in 1966. The SBE became an operating body in 1969. It supervises elementary and secondary education in Kansas.

### IV. *Legal Principles.*

Since 1955, the defendant school district and its predecessor have been charged "with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green v. County School Board,* 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). "Each instance of a failure or refusal to fulfill this affirmative duty continues the violation of the Fourteenth Amendment." *Columbus Board of Education v. Penick,* 443 U.S. 449, 459, 99 S.Ct. 2941, 2947, 61 L.Ed.2d 666 (1979).

Unfortunately, even in 1987, it is not clear what unitariness entails. Note, *Allocating the Burden of Proof After A Finding of Unitariness in School Desegregation Litigation,* 100 HARV.L.REV. 653, 662 (1987). "[T]he nature of the desegregation remedy is to be determined by the nature and scope of the constitutional violation." *Milliken v. Bradley,* 433 U.S. 267, 280, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977). *De facto* segregation (segregation caused by private choice) and segregation caused by authorities other than those sued in this case, are not part of the constitutional violation found in 1954. See *Keyes v. School District No. 1,* 413 U.S. 189, 198, 93 S.Ct. 2686, 2692, 37 L.Ed.2d 548 (1973); *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 23, 91 S.Ct. 1267,

1279, 28 L.Ed.2d 554 (1971). Therefore, a unitary school system must be one that has reversed the segregation caused by the school board's dual system in 1954. *Dayton Board of Education v. Brinkman*, 443 U.S. 526, 538, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979) ("Dayton II").

The mixing of students of different races in the schools is probably the most important factor in determining unitariness. (After all, separate but *equal* schools violate the Constitution.) But, complete racial balance is not required by the Constitution. *Swann, supra,* 402 U.S. at 24, 91 S.Ct. at 1280; *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 413 and 417, 97 S.Ct. 2766, 2772 and 2774, 53 L.Ed.2d 851 (1977) ("Dayton I"). Even the existence of a "small number of one-race or virtually one-race schools within a district is not in and of itself the mark of a system that still practices segregation by law." *Swann, supra,* 402 U.S. at 26, 91 S.Ct. at 1281. Many other factors should be considered as well. *Green, supra,* 391 U.S. at 435, 88 S.Ct. at 1692 (faculty, staff, transportation, extracurricular activities and facilities); *Keyes, supra,* 413 U.S. at 196, 213–14, 93 S.Ct. at 2691, 2699–700 (school site location, school size, school renovations and additions, student attendance zones, student assignment and transfer options, mobile classroom units, transportation of students, assignment of faculty and staff, community and school administration attitudes).

Evidence of segregative motive or the absence of such intent is relevant but not controlling in determining unitariness. "The measure of the post-Brown I conduct of a school board under an unsatisfied duty to liquidate a dual system is the effectiveness, not the purpose, of the actions in decreasing or increasing the segregation caused by the dual system." *Dayton II, supra,* 443 U.S. at 538, 99 S.Ct. at 2935.

In sum, a unitary school system is one in which the characteristics of the 1954 dual system either do not exist or, if they exist, are not the result of past or present inten-tional segregative conduct of defendants or their predecessors.

## V. The Progress of Desegregation in Unified School District # 501.

Desegregation started in Topeka's public schools prior to the landmark Supreme Court decision in this case. In 1951, there was only one public high school. It served white and black students. Segregation in Topeka's junior high schools had been declared unconstitutional by the Kansas Supreme Court in 1941. *Graham v. Board of Education,* 153 Kan. 840, 114 P.2d 313 (1941). In September 1953, black elementary students who lived in the districts of two all-white elementary schools (Randolph and Southwest) were permitted to attend those schools. In January 1954, twelve other formerly all-white elementary schools permitted black student enrollment.

One of the all-black elementary schools, McKinley, was closed at the end of the 1954–55 school year, when this case was remanded by the Supreme Court. By the 1955–56 school year, black elementary students attended eighteen of the twenty-three elementary schools. The following school year, fifty-six percent of black elementary students attended formerly all-white schools; sixty-seven percent of white students attended schools with black students.[1]

In 1959, Buchanan Elementary School, a *de jure* black school which had remained all black or virtually all black, was closed. Washington Elementary School, the penultimate *de jure* black school in operation, was closed in 1962.

By the 1968–69 school year, further progress at desegregation was evident. The last *de jure* black school (Monroe) had a twenty-five percent white student population. It was one of four schools, out of thirty-four elementary schools, with a majority black student population: Belvoir (56.76%); Lafayette (52.68%); Monroe (74.78%); Parkdale (90.84%). Roughly fifty percent of black elementary students attended schools with majority black student

1. Unless stated otherwise, the numbers stated in this opinion do not include students attending special programs such as Head Start, Capitol City School, or special education programs.

populations. The percentage attending schools with a black student population of seventy-five percent or greater was 27.5%. Approximately fifty percent of all white students attended schools which were ninety percent or more white.

Of the eleven junior high schools, one had a majority minority student population—East Topeka Junior High (60.43%). Roughly forty percent of all black junior high school students attended this school. Approximately sixty percent of all white junior high school students attended schools with white populations exceeding ninety percent.

In the 1968–69 school year, there were three high schools in U.S.D. # 501. None of the high schools had a majority minority population. Topeka West High School was virtually all white (98.36%). Roughly a third of all white high school students attended this school.

During the 1968–69 school year, the total minority student population was approximately seventeen percent; the total black student population was near twelve percent.

The student attendance figures for the 1985–86 school year bear little resemblance to the figures for 1954. None of the former de jure black schools was open in 1985. Of the twenty-six elementary schools, only one had a majority black student population.[2] Three had majority minority populations: Belvoir (61.86%); Lafayette (56.81%); and Highland Park North (57.93%). Roughly twenty-nine percent of all black elementary students attended these schools. Five elementary schools had student populations over ninety percent white. These schools accounted for approximately twenty-four percent of the white elementary student population. No school had a ninety-five percent white student population.

In 1980, the school district changed from a junior high (grades seven through nine) to a middle school format (grades seven and eight). In the 1985–86 school year, no middle school had a majority minority student population. Two middle schools had white student populations exceeding ninety percent—French (93.77%) and Landon (90.71%). These two schools served approximately thirty-one percent of the white middle school student population. Landon has since been closed and its student population has been assigned to French.

None of the three high schools in the district had a majority minority population in the 1985–86 school year. One high school, Topeka West High School, had a white student population exceeding ninety percent—92.06%. It served roughly forty-one percent of all white high school students in the district.

The student population for the 1985–86 school year was 26.1% minority and 18.6% black.

In sum, when this case was filed, 100% of black elementary students attended 100% black schools. Last school year, only eight percent of black elementary students attended a majority black school. Even in this school (Belvoir), there was a substantial white student population (38.14%).[3]

## VI. *Plaintiffs' Contentions.*

Plaintiffs acknowledge the substantial progress made toward desegregation in U.S.D. # 501. Plaintiffs contend, however, that over the years the district has passed up opportunities to improve racial balance throughout the district; that the vestiges of the de jure system of segregation remain in the form of "racially identifiable" schools; and that the existence of these schools illustrates that the mandate of the Supreme Court remains unfulfilled. Plaintiffs stress statistical measures of racial identity. Under these measures, if the racial apportionment of students in one school varies from the district average by too great a percentage, then the school is racially identifiable.

---

2. Highland Park North Elementary School was one student short of a 50% black student body.

3. There was testimony that the minority student population of Belvoir increased to 66% in the current school year.

Plaintiffs assert that the racial identity of schools, as determined by student racial ratios, is corroborated by faculty and staff assignments, community attitudes and students' test scores. Plaintiffs further contend that the racial identity of schools has been maintained by a variety of means (e.g., school site location, optional attendance zones, school additions and boundary location).

## VII. *Defendants' Contentions.*

Defendants contend that U.S.D. # 501 is now a unitary school system. Defendants believe plaintiffs place too much emphasis on the racial balance of students as a measure of a constitutional violation, and that demographic forces or other forces beyond the school district's control are responsible for the racial imbalance present in the schools. Defendants believe that factors other than student assignment count in the determination of a constitutional violation, and that these factors (e.g., allocation of resources, uniformity of curricula and instruction) indicate the district operates a unitary school system.

## VIII. *Burden of Proof.*

Plaintiffs have the burden of proving that illegal segregation exists in U.S.D. # 501. Whether the burden of proof should shift to the defendants to prove that illegal segregation does not exist, because of the history of intentional segregation within the district or because of the racial imbalance in the schools' student bodies today, is a difficult question. The passage of time, demographic dynamics and changes in administrative personnel detract from the justification for the *Keyes* presumption in this case.[4] Nor does this case fit the *Swann* presumption easily.[5] Re-

gardless of the operation of these presumptions, the court believes defendants have proven by a preponderance of the evidence that U.S.D. # 501 is a unitary school system.

## IX. *Does Illegal Segregation Remain in U.S.D. # 501?*

### A. *Statistical Measures of Student Population.*

The court shall examine many factors to decide whether illegal segregation exists in U.S.D. # 501. But, the statistical measures of the racial makeup of the schools' student bodies are of prime importance. Often in school desegregation cases such statistics alone prove a pattern of discrimination. The separation of the races is the chief vestige of *de jure* segregation. If the races are no longer separated, then the system may be unitary. Since the separation of students by race can be represented statistically, such measures are important to this case.[6]

A major issue in this case is the importance of statistical racial *balance* throughout the district—i.e., maintaining a ratio of students in each school that approximates the racial mix of the entire district. The statistics indicate that white and minority students are not separated by race. Significant numbers of white and nonwhite students attend every school in the district. But, there are disparities in the racial makeup of various schools' enrollments. Plaintiffs hinge their case on this absence of racial balance in all schools and the failure of the defendants to take action to promote racial balance.

Plaintiffs suggest that a school is racially identifiable or imbalanced if its percentage of minority students falls beyond ±

**4.** In *Keyes, supra,* 413 U.S. at 208, 93 S.Ct. at 2697, the Court held that proof of "intentionally segregative school board actions in a meaningful portion of a school system ... creates a presumption that other segregated schooling within the system is not adventitious."

**5.** In *Swann, supra,* 402 U.S. at 26, 91 S.Ct. at 1281, the Court held that school authorities had the burden of proving that student assignments were "genuinely nondiscriminatory" when a de-

segregation plan left "some schools that are all or predominantly of one race ..."

**6.** Racial inventories of students in the district were not kept between 1956 and 1966. The first complete inventory available to the court is for the 1967–68 school year. So, precise measures of racial mixing are not known for the first decade following the remand of the case from the Supreme Court.

15% of the district average of minority students. For instance, since about 26% of the district's elementary students are non-white, plaintiffs contend that a school with a minority enrollment of less than 11% is a "white" school, and a school with a minority population of more than 41% is a "non-white" school. Plaintiffs agree that tighter and wider ranges of racial balance have been used in desegregation litigation, but emphasize that under any range some racially identifiable or imbalanced schools exist in the district.[7] Since the district is responsible for student assignment, it is responsible for the racially identifiable schools.

■ Undoubtedly, racial imbalance *can* be the result of past segregative acts by school authorities. But, racial imbalance is unconstitutional only if it *is* caused by defendants' purposeful racial discrimination. See *Columbus Board of Education v. Penick, supra,* 443 U.S. at 464–65, 99 S.Ct. at 2950; *Dayton I, supra,* 433 U.S. at 420, 97 S.Ct. at 2775; *Washington v. Davis,* 426 U.S. 229, 240, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). The Supreme Court has held that racial balance is not a constitutional imperative even in districts with a history of purposeful segregation. *Swann, supra,* 402 U.S. at 24, 91 S.Ct. at 1280; *Dayton I, supra,* 433 U.S. at 417, 97 S.Ct. at 2774; *Milliken v. Bradley, supra,* 433 U.S. at 280 n. 14, 97 S.Ct. at 2757 n. 14. Other courts have approved mandatory desegregation plans in which schools fell outside the ± 15% or ± 20% range of racial balance. See *Price v. Denison Independent School District,* 694 F.2d 334 (5th Cir.1982); *Diaz v. San Jose Unified School Dt.,* 633 F.Supp. 808, 814 (N.D.Cal.1985); *Singleton v. Jackson Municipal Separate School Dt.,* 541 F.Supp. 904 (S.D.Miss. 1981). (The *Price* case contains an extensive, well-reasoned criticism of a trial court's reliance upon statistical racial imbalance among schools in Denison, Texas to prove illegal segregation.) Therefore, racial balance is not an essential attribute of a unitary school system.

Nevertheless, racially conscious student assignment with the goal of racial balance has been approved as a remedy in desegregation litigation. *Swann, supra,* 402 U.S. at 25, 91 S.Ct. at 1280. This is because school segregation has an inertia which often cannot be countered by a purely neutral force. In order to achieve "the greatest possible degree of actual desegregation," (*Swann, supra,* 402 U.S. at 26, 91 S.Ct. at 1281) and, perhaps, to spread the burdens and advantages of desegregation uniformly throughout a district, courts have used racial balance as a target for remedial action.

Still, the need for a remedial decree targeted toward racial balance depends upon whether the present imbalance derives from the *de jure* system or other intentional discrimination. It is difficult to trace the cause of racial imbalance from the record of this case. A race-neutral system of student assignment based on neighborhood schools has been employed in the district for more than three decades. Although there is some dispute as to whether racial balance has been maximized under the constraints of this system, it cannot be gainsaid that residence rather than race determines school attendance in the district and that the effects of *de jure* segregation have been substantially countered.

It could be argued that current racial residential patterns and, in turn, student attendance patterns have been affected by defendants' past discriminatory acts, but there has been little or no evidence to support this contention. Obviously, several forces, both social and economic, can influence residential choice. See *Milliken v. Bradley,* 418 U.S. 717, 756 n. 2, 94 S.Ct. 3112, 3133 n. 2, 41 L.Ed.2d 1069 (1974) (Stewart, J., concurring); *Austin Independent School District v. United States,* 429 U.S. 990, 994, 97 S.Ct. 517, 519, 50 L.Ed.2d

---

7. One could contend that for a school to be racially identifiable, the student population should be balanced at fifty percent white and fifty percent nonwhite. This is not plaintiffs' view. They argue that, in Topeka, a fifty percent nonwhite school is identifiably nonwhite because the size of the deviation from the district average of nonwhite students means the school has significantly more nonwhite students than other schools.

603 (1976) (Powell, J., concurring). Thirty years ago, the then Attorney General of Kansas speculated that segregated residential patterns in Topeka were influenced by the segregated school system. There is good reason to question the strength of the alleged causality, however. For instance, black students received free transportation to black elementary schools under the *de jure* system. (Linda Brown lived near the white Sumner School and took a bus to Monroe.) This may have reduced the incentive to live near black schools. Additionally, in most instances white schools were located near black schools (Lowman Hill near Buchanan; Parkdale near Washington; Grant near McKinley; Van Buren near Monroe). This may have dissipated segregated residential patterns. Finally, two expert witnesses gave conflicting views of current research on whether school segregation causes residential segregation.

The only evidence concerning the district's recent actions regarding housing indicates that the district has opposed housing projects which might impede racial balance, and that the district has attempted to persuade realtors of the uniform quality of the public schools across the district.

Even assuming the influence of school segregation upon residential choice 30 years ago, the steady progress of school and residential integration in Topeka over three decades (particularly in formerly segregated attendance zones) indicates that the effects of school segregation on residential choice, if any, are not cognizable today.[8]

Therefore, although the issue in this case is whether additional remedial action is appropriate, it is inappropriate to use racial balance (a remedial target) as the determining factor of whether remedial action is necessary because: 1) racial balance is not a *per se* measure of an unconstitutional level of segregation; and 2) after 30 years, one cannot assume that the racial imbalance which remains is a vestige of the *de jure* system or other illegal segregation. The court concludes that statistical measures of racial mixing are an important factor in determining whether vestiges of segregation remain in U.S.D. # 501. But, the issue is not decided by whether the schools are racially balanced.

The statistics indicate that students in U.S.D. # 501 are not separated by race. The smallest percentage of white students in any school in the 1985–86 school year was thirty-eight percent. The smallest percentage of nonwhite students in any school was six percent. Of thirty-five schools, three had minority populations exceeding fifty percent; eight had white populations exceeding ninety percent. Only one school had a black student population which exceeded fifty percent. Only eight percent of all black elementary students (4.7% of all black students) attended this school. Only twenty-four percent of all white elementary students attended schools with white student populations exceeding ninety percent. In the 1985–86 school year, there were two middle schools with white populations exceeding ninety percent. The student populations of the two schools have been consolidated for the 1986–87 school year. One of plaintiffs' experts, Dr. Gordon Foster, testified that if trends continue, the consolidated school will soon become racially balanced as measured by the ± 15% standard. Forty-one percent of the district's white high school students attend a high school with a ninety-two percent white population. But the nonwhite student population of this school is within sixteen percent of the district average of nonwhite high school students. Dr. Foster also predicted that this school would soon become racially nonidentifiable.

When one totals the student populations of the eight schools plaintiffs have labeled as racially identifiable nonwhite or vestige schools (Eisenhower Middle School and the following elementary schools: Quinton Heights, Lowman Hill, Highland Park

---

**8.** School integration may lead to white flight and residential segregation. There was slight evidence in this case that some white flight resulted from integration of the elementary schools. But, the evidence did not establish that current residential patterns have been significantly affected by white flight.

North, Hudson, Lafayette, Avondale East and Belvoir), one finds that the schools are attended by more white students than black students (1,248 white students, 1,079 black students). Indeed, white students make up close to half (49.3%) of all the students that attend these allegedly non-white schools.

Statistical indices designed to measure deviation from racial balance (dissimilarity) and opportunity for interracial contact (exposure) indicate relatively high levels of integration in U.S.D. # 501, although the levels may be lower than other school systems with mandatory busing plans or other more aggressive racially conscious student assignment plans. In general, the statistical measures of racial balance have been stable over the past five years.[9]

The student attendance figures for U.S.D. # 501 reflect an enduring integrated nondiscriminatory system of education. Although racial balance has not been achieved, students are not separated on the basis of race. Thus, a vestige of segregation has been eliminated.

B. *Student Transfer Policy.*

The evidence does not suggest that transfers have been permitted to avoid racial mixing. Indeed, in recent years, the student transfer policy has been used to improve racial balance of schools within the district. In 1978, a policy allowing students freedom of choice within the district was adopted. Within two years, the policy was discontinued because it contributed slightly to racial imbalance. In 1980, a majority to minority transfer policy was established. It is still in effect. Under this policy, transfers which do not improve racial balance are disallowed. Therefore, the district has employed a student transfer policy which encourages integration, not segregation.

C. *Optional Attendance Zones.*

Students residing in optional attendance zones have the option of attending more than one school. The use of optional attendance zones has been scrutinized because optional zones may allow white students living in racially mixed districts to attend an adjacent white school rather than a racially mixed school. Optional zones were used in Topeka's public schools before 1954. Since 1954, optional zones have been used in racially mixed residential areas and all-white locations. Hence, optional zones, if they had a segregative purpose, were not used solely to segregate. A large number of optional zones were eliminated in 1964. All optional zones were eliminated in 1976. It is difficult to determine the effect of optional zones in U.S.D. # 501 without knowing how many children lived in the zones or how children of different races exercised their options. Defendants estimated, without direct contradiction, that 7.6% of elementary students and 9.2% of junior high students lived in optional zones in the 1963–64 school year. Defendants' expert, Dr. William Clark, also concluded the zones did not have a significant segregative effect. The court believes any segregative effect of the zones was slight and does not remain today.

D. *Space Additions.*

Plaintiffs have criticized the use of space additions, such as portable classrooms, at racially imbalanced schools. Plaintiffs have alleged that school authorities chose to perpetuate segregation at these schools (particularly "white" schools), instead of shifting school boundaries or otherwise reassigning students in a manner that would improve racial balance. For instance, in some cases, additions were made to racially imbalanced schools in areas of residential growth when schools in the more racially mixed central parts of Topeka were becoming underutilized.

The use of space additions was consistent with a race-neutral neighborhood school policy. It was not a widespread practice, for instance, to expand school

9. The number of "racially identifiable" schools (using the ± 15% standard) has increased from nine to fifteen in recent years. But, this increase involves four schools which in their history have crisscrossed the ± 15% threshold and two schools which have had gradually growing minority populations. The increase does not appear to have been caused by district action.

boundaries and make space additions to allow children to avoid integrated school settings. Nor were students encouraged to transfer to segregated schools at which space additions were made. Furthermore, it appears from the report of plaintiffs' expert, William Lamson, that space additions were employed at predominantly white, predominantly nonwhite and racially balanced schools. Ex. 219 at 185. It is possible that actions inconsistent with neighborhood schools could have been taken to avoid space additions and improve racial balance. But, it has not been shown that space additions were intentionally used to promote segregation or that schools are racially imbalanced today because of space additions.[10]

### E. School Closings.

The school closings over thirty years in the district indicate a policy of desegregation. All four de jure black schools have been closed. The de jure black school (McKinley) in North Topeka, the small area of the city north of the Kansas River, was closed in 1955 and the black children were assigned to Grant or Quincy elementary schools. Grant was closed in 1977. Now all elementary students in North Topeka attend Quincy School. Washington and Buchanan schools were both closed by 1962. Monroe was closed in 1978. The Pierce School was closed in 1959, one year after its attendance zone was annexed into the district. It was an all-black school. When Parkdale was closed in 1978, it had a minority student population of 85.62%. Three schools in central Topeka closed with relatively high minority populations—Van Buren (1964, 40% est.); Central Park (1980, 42.9%); Polk (1979, 48%). Three schools with relatively low minority populations have been closed—Dawson (1966, 0% est.); Sheldon (1977, 3%); Landon Middle School (1986, 9.2%). Three schools were closed when they had minority populations near the district average—Rice (1981, 33.5%); Grant (1977, 21%); Clay (1975, 25.3%).[11]

Although a few schools with desirable racial balances have been closed, there is no pattern of closing schools to avoid racial mixing. Indeed, on the whole, the closing of schools appears to have been an integrative device.

### F. School Openings.

Several schools with virtually all-white enrollments opened in the 1950s or early 1960s. These schools included McClure, Sheldon, McEachron, McCarter, Bishop and Hudson elementary schools, as well as Jardine, Eisenhower and Landon junior high schools, and Topeka West Senior High School. These schools were in areas of residential expansion. During the same period, new schools with mixed racial compositions replaced existing facilities at Lowman Hill, Lafayette, Highland Park Central, Central Park and Belvoir elementary schools. The latter two schools were built in 1967. Linn Elementary School was built in 1964 and appears to have had a significant minority enrollment.[12] In 1970, French Junior High School opened as a predominantly white school. In 1980, Chase Middle School opened as a racially mixed school and Central Park Elementary School reopened as Robinson Middle School, a racially mixed school.

10. Plaintiffs chose to emphasize that virtually all the portable classrooms placed at the senior high schools were placed at Topeka West High School—the identifiably "white" senior high school in the district. Of course, if portable classrooms had not been placed at Topeka West, the racial identity of the school would not have changed. Instead, more students would have attended the other high schools which may have had a better racial balance, but which were probably overcrowded. Plaintiffs have not denied the overcrowding problems experienced at the high schools. Nor was the feasibility of placing portable classrooms at other schools well established. Placing portable classrooms at Topeka High, the school adjacent to Topeka West, would have been very difficult. Even by plaintiffs' standard, Topeka West is now on the threshold of racial balance. Therefore, the placement of portable classrooms at Topeka West has not prevented desegregation.

11. The Lincoln Elementary School was racially mixed when it closed in 1962.

12. In 1966, Linn had a minority population of 5.7% versus a district average of 16.5%. By 1969, the minority enrollment had grown to 12.5%.

Although, on its face, the construction of schools, particularly on the west side of the district, appears to have promoted racial separation, the court does not believe that the district's school construction policy was intended to maintain or promote segregation. Most of the construction occurred during the peak years of student enrollment. More schools were needed. The location of the schools in areas of residential expansion was consistent with the race-neutral neighborhood school concept. There is no evidence that the students attending these schools could have been accommodated in the existing schools or that land was available in the older, more racially mixed areas of the district to build new schools.

Furthermore, the racially mixed schools were not being closed during this period of construction. Instead, new schools were being built in areas of residential integration. The schools being closed were formerly *de jure* black schools or schools with high minority enrollments; the possible exception being Lincoln Elementary School, which was located in an urban renewal site. Finally, over the years there has been increasing residential and school integration in the areas where the once all-white schools were constructed. In sum, it does not appear that the district's school construction policy has promoted segregated residential patterns or segregated schools.

### G. *Schoolsite Location.*

Plaintiffs have criticized the decision to place a high school on the west side of Topeka—i.e., the construction of Topeka West High School in 1960. The evidence is convincing that Topeka West High School was built in response to the overcrowding of Topeka High School and the expansion of the student population in the western parts of Topeka. At the time Topeka West was built, the district had recently annexed a high school serving the east side of Topeka, Highland Park High School. Since Topeka High was centrally located, a new high school on the west side of the city was a logical response to overcrowding. If the three high schools were aligned vertically (north to south) on a map and had attendance areas for each school which included east, west and central Topeka, then the high schools of the district would be more racially balanced. But, there has not been a persuasive showing that this alternative was practical or necessary to avoid the separation of white and black high school students in the district. The court believes the siting of Topeka West High School was a race-neutral decision.

### H. *School Boundary Location.*

A review of the school boundaries as they have developed over thirty years does not reveal a segregative pattern that remains today. The boundaries set around the former *de jure* black elementary schools after this case was remanded by the Supreme Court appear to have perpetuated the racial identity of those schools. But, the schools have long been closed and the segregative effects of those boundaries have attenuated entirely.

By and large, the school attendance boundaries of the district reflect a commitment to neighborhood schools. Schools are centrally located in their attendance areas. Some attendance areas, e.g., Gage, McCarter, McClure, Stout, Quinton Heights and State Street, are long. But, these areas include large land tracts without residential population.

The attendance zones of schools with high minority populations are not gerrymandered to produce this result. In general, schools with high minority populations are not in areas with an average or higher than average white population. Nor are they near low minority schools in areas of average racial mixture.

Belvoir Elementary School is centered in an area with a high minority population. It is surrounded by other schools with higher than average minority populations. It is not *the* black school in a racially mixed area. It is a school with a higher than average black student population in a residential area with a higher than average black population. Highland Park North Elementary School, Lafayette Elementary

School and Hudson Elementary School are similarly situated.

Quinton Heights and Avondale East elementary schools have higher than average minority populations, but they are surrounded by schools with mostly average to higher than average minority percentages.

Perhaps the most suspect school is Lowman Hill Elementary School. Lowman Hill has a higher than average minority population, but it is bordered on three sides by schools with lower than average minority populations (Potwin, Gage and Randolph). It is also bordered by Sumner Elementary School which is slightly above the district average for minority population. Although Lowman Hill has had a higher than average minority population, it has never had a majority minority population, and its minority percentage has been within fifteen percent of the district average in recent years.

Lowman Hill is centrally located within its attendance area, as are the schools which surround it. Its boundaries include two historically black residential areas which are closer to the Lowman Hill School than the other schools in the area. The boundaries of Potwin and Gage have remained relatively stable over twenty years. The boundaries of Randolph and Sumner have been expanded to increase the minority populations of the schools. Although Gage and Potwin have been predominantly white schools since the Supreme Court's decision in this case, the court cannot say that Lowman Hill is an isolated black school or a vestige school when its boundaries for two decades have been consistent with the neighborhood school concept; it has never had a majority minority student population; and, in recent years it has been relatively close to the district average for minority enrollment.

One of plaintiffs' criticisms of the district's course of desegregation is that schools with a higher than average minority population have been assigned students from closed schools that had even higher minority populations. For instance, Quinton Heights ultimately received students from Monroe. Lafayette and Highland Park North received students from Park-dale. Again, this is a product of a race-neutral neighborhood school concept. Students from closed schools were sent to nearby schools. Racial balance would have been improved to a greater degree if students from a closed school with a high minority population were transported to a noncontiguous attendance area with a low minority population, or if white children were transported the opposite direction. But, this would have breached the neighborhood school policy consistently applied by the district. Plaintiffs' witness testimony also suggested that boundaries could shift in more than one attendance area (in a ripple effect) to more evenly distribute the minority student population after a school with a high minority population was closed. The feasibility of such a plan was not convincingly established in the evidence. Obviously, such efforts would detract from the central location of schools in their attendance areas and, to some extent, diminish the advantages of neighborhood schools.

In summary, the district's attendance zones are not segregatively gerrymandered. The district has consistently applied race-neutral, neighborhood school principles to the demarcation of attendance zones.

### I. *History of the Schools.*

To reiterate, none of the four former *de jure* black elementary schools are open. Three of the four were closed by 1962. The fourth was closed ten years ago. Of the eighteen white elementary schools operating in 1954: seven have been closed; three have minority populations between five and ten percent; three have minority populations between forty and fifty percent; the remaining five schools have minority populations near the district average, between fifteen and thirty-two percent.

A history of the allegedly racially identifiable nonwhite schools follows.

*Belvoir.* The Belvoir School area was annexed into the district in 1960. The school had an average or slightly above average minority population at the time.

In the 1960s, after the construction of two federally-subsidized housing projects in close proximity to the school, the minority population of the school increased to more than fifty percent. The minority student percentage continued to rise in the 1970s. After the Rice School was closed in 1981 and part of its population was combined with Belvoir, the minority percentage declined to sixty to sixty-five percent. In sum, Belvoir was a racially balanced school which became a majority black and minority school with the influx of minority residents into the attendance area. The increase of minority students at Belvoir was not caused by the school district. Indeed, the school district has taken action to modify the racial imbalance that exists at the school.

*Hudson.* When Hudson was constructed in 1963, it was an all-white school. After the construction of subsidized housing projects in the Hudson attendance area, and with the general increase of minority residents on the east side, Highland Park area, the minority student population of Hudson grew rapidly in the late sixties and early seventies. In 1983, the minority student population of Hudson exceeded forty percent for the first time.

*Avondale East.* The land representing the Avondale East attendance area was annexed into the district in 1959. In the 1967–68 school year, the school had a minority population of sixteen percent. The minority population grew rapidly in the following few years and then stabilized in the 1970s in the thirty to thirty-five percent range. In 1984, the school exceeded forty percent in minority population for the first time. The school boundaries of Avondale East and Hudson have been relatively stable through the years. The increase in minority population at both schools appears to be the result of residential movement.

*Highland Park North.* The Highland Park North attendance area was annexed by the district in 1959. In the 1967–68 school year, the school had a minority student percentage of thirty percent. The average for the school district's elementary student population was seventeen percent.

The minority percentage increased with the movement of minority residents to the attendance area. In 1978, with the addition of a large part of the Parkdale attendance area, the minority student percentage of Highland Park North grew from forty-seven to fifty-eight percent. When it closed, Parkdale had a minority percentage of 85.6%. In 1954, Parkdale was an all-white school located near the *de jure* black Washington School. After the Supreme Court decision in 1955, Parkdale enrolled a minority population of 14.7%. This increased to twenty-four percent in 1956. When Washington was closed, its attendance area was added to the Parkdale district. Of course, this increased Parkdale's minority population significantly. Parkdale became a predominantly black school. When Parkdale was closed, its attendance area was split between the two closest schools—Highland Park North and Lafayette. Since 1978, the minority percentage at Highland Park North has remained around fifty-eight percent. Approximately fifty percent of the minority student population is black. The school district has contributed to the racial imbalance at Highland Park North only to the extent that it closed a school with a much higher minority percentage and assigned some of the students to Highland Park North.

*Lafayette.* Lafayette was an all-white school prior to the end of *de jure* segregation. In 1955, it had a minority population of 8.4%. This increased the following year to 13.7%. By 1968, the minority percentage at Lafayette was fifty-nine percent. When Parkdale was closed, Lafayette received part of the Parkdale attendance area. As a result, Lafayette's minority percentage increased from sixty-two to sixty-six percent. This figure has decreased in subsequent years. One factor in the decline may have been the assignment of part of the Rice School attendance area to Lafayette in 1981. For the last five years, Lafayette has had a minority population of fifty-six to fifty-nine percent. It should be noted that Lafayette has had a significant nonblack minority population. In the 1967–68 school year, the school had a twenty-nine percent nonblack minority percentage.

In the 1985–86 school year, the school had a fifteen percent nonblack minority percentage.

*Quinton Heights.* Quinton Heights was an all-white elementary school prior to the end of *de jure* segregation. In 1955, it had a minority percentage of 2.8%. This increased to 7.26% the following year. By 1968, the minority population had increased to thirty-five percent. In September 1979, after the closing of Monroe and Polk Elementary schools, Quinton Heights acquired the Monroe school attendance area. Its minority percentage increased to fifty percent in 1979. The minority percentage was approximately the same in 1985.

*Lowman Hill.* Lowman Hill Elementary School was an all-white school located near the *de jure* black Buchanan School prior to the Supreme Court decisions in this case. In 1955, Lowman Hill had a black population of 11.4%. This increased to 17.4% the following year. In 1959, Buchanan was closed, and its students were assigned to a new school at the Lowman Hill site. Plaintiffs' expert testimony estimated that this increased Lowman Hill's minority percentage to forty-three percent. Since that time, Lowman Hill's attendance area has been expanded to include parts of the Clay, Polk and Central Park attendance areas. For the last five years, Lowman Hill's minority student population has fluctuated between thirty-six and forty-one percent.

*Eisenhower Middle School.* This attendance area was annexed into the district in 1959. In the 1967–68 school year, Eisenhower Junior High had a minority percentage of 5.78%. This increased to twenty percent in 1974 and twenty-nine percent in 1977. After the change to the middle school system in 1980, Eisenhower Middle School was one of six middle schools in the district and had a minority percentage of forty-five percent—approximately twenty percent above the district average for middle school students. In 1985, the minority percentage at Eisenhower Middle School was 48.6% and the district's minority average for middle school students was 26.9%.

To summarize, none of those schools plaintiffs allege to be racially identifiable nonwhite have been racially identifiable by plaintiffs' measures throughout the history of this case. Two factors have contributed to the increase of minority students at these schools. First, for all of the schools, there has been an increased percentage of minority residents in their attendance areas. In other words, the attendance areas have undergone a racial transition not caused by district action. Second, some of the schools have been affected by the expansion of attendance areas to include the attendance zones of schools with large minority populations. On the whole, the closing of the highly imbalanced schools had a desegregative effect upon the district's operation, although it aggravated the imbalance of nearby schools. The assignment of students from areas of minority concentration to nearby schools with higher than average minority populations was consistent with the race-neutral neighborhood school policy of the district. There has been no showing that assigning the student populations of the closed schools to other adjacent attendance zones would have significantly improved the racial balance of the district today.

Plaintiffs have also alleged that several schools are racially identifiable as white schools. Two of the allegedly identifiable white schools are Gage and Potwin elementary schools. These schools were all-white before and after the Supreme Court decisions in this case. In 1967, each school had only one minority student. In 1985, Gage had twenty-five minority students—9.4% of its student population; Potwin had eighteen minority students—7.7% of its student population. There are other elementary schools with low minority percentages: Bishop (10.5%); Crestview (8.9%); McCarter (9.16%); McClure (7.21%); McEachron (10.31%); Whitson (10.22%). These schools are located in west or southwest Topeka where there has been steady residential development over thirty years. All of the schools, like Gage and Potwin, have experienced increasing minority student populations. All of the schools, including Gage and Potwin, have had relatively stable attendance boundaries. One of plaintiffs' witnesses testified that if trends continue,

the secondary schools which serve the western part of Topeka will become racially nonidentifiable, as measured by minority student percentage. One can assume that this may also occur in the elementary schools serving the same area. In sum, the district has several schools which historically have had low minority populations. These minority populations are growing, however, without opposition by the school district.

### J. *Facilities.*

There is no significant disparity in the quality of facilities available in schools throughout the district.

### K. *Extracurricular Activities.*

There is no discrimination in the conduct of extracurricular activities in the district. Indeed, multiracial participation is guaranteed in certain activities such as cheerleading and student government.

### L. *Curriculum.*

There is no significant disparity in the curriculum and progress of study in the schools throughout the district. In recent years, the district has taken diligent and meticulous steps with the development and use of curriculum guides to assure that all schools and all grades work consistently toward specific and uniform academic goals.

### M. *Transportation.*

There is no discrimination in the provision of transportation in the school district.

### N. *Faculty and Staff.*

Plaintiffs demonstrated that in the years immediately following the Supreme Court decisions, the district discriminated in the hiring and placement of minority staff. In 1963, however, the district passed a resolution against discrimination in the hiring and employment of personnel. At least since

1976, the district has had an affirmative action program and has tried to recruit minority faculty and staff.

In the 1985–86 school year, the district's work force was 12.1% minority. Minority employees were represented at all levels of the work force. Twenty percent of the service workers were minority members. Approximately fifteen percent of the managerial workers were minority members. The current superintendent is a black man, as are the principals of two of the three high schools (Topeka West High School and Highland Park High School). No criticism of the district's affirmative action policy has been made in this case. Nor have the district's hiring policies in recent times been shown to be discriminatory.

Plaintiffs' major contention with regard to faculty and staff is that the assignment of faculty and staff has served to racially identify schools in the district. Plaintiffs have demonstrated that in general there are a greater than average number of minority faculty and staff in schools with a greater than average number of minority students. Elementary schools with minority enrollments greater than fifteen percent of the district average had fifty-three percent of the minority staff at all the district's elementary schools in 1985.[13] Elementary schools with minority enrollments greater than fifty percent had twenty percent of the minority staff at all the district's elementary schools. Elementary schools with minority enrollments less than fifteen percent of the district average had sixteen percent of the district's minority staff at elementary schools.

In the 1985–86 school year, minority staff assignments at the elementary schools ranged from zero percent at McClure to thirty-three percent at Avondale East.[14] These figures have varied over the years, however. During the last ten years, both Avondale East and McClure have had minority staff percentages very

---

13. The "faculty and staff" data available to the court are for the school years 1973–74 to 1985–86. The data lump together faculty and other employees assigned to the schools. Figures for

faculty assignments only are available for the 1981–82 school year alone.

14. The minority staff percentage for all elementary schools was 11.23%.

close to the district average. In the 1977–78 school year, Avondale East had a minority staff percentage of 14.6%; one year later, the figure was 9.8%. In the 1979–80 school year, McClure had an 11.6% minority staff.

At the high school and middle school levels in the 1985–86 school year, minority staff percentages ranged from 24.7% at Robinson Middle School to 2.5% at Topeka West High School.[15] Again, these percentages have fluctuated. In the 1984–85 school year, Topeka West had a 7.5% minority staff. In the 1980–81 school year, Robinson Middle School had a 9.1% minority staff—a figure below the district average for that school year.

In the 1985–86 school year, Belvoir, with the highest minority elementary student percentage, and Potwin, with the second lowest, had virtually equal minority staff percentages. Highland Park High School, with an above average minority student percentage had a below average minority staff percentage. The sole secondary school with a minority enrollment greater than fifteen percent of the district average (Eisenhower Middle School), had only fourteen percent of the minority staff at the secondary level. Thus, there are clear exceptions to the trend demonstrated by plaintiffs.

Moreover, the difference between having a greater than average number of minority staff and having a less than average number of minority staff is very small in most cases. Only six schools in 1985 had minority staff percentages beyond ± 10% of the district average for elementary and secondary schools.[16] Three of these schools were within eleven percent of the district average. Furthermore, all of the schools have been within the ± 10% range in the last ten years.

Perhaps as important as the racial percentages of the faculty and staff is the fair assignment of qualified and dedicated faculty throughout the district. The principals assigned to two schools with relatively high minority student percentages, Highland Park North and Lafayette, have received awards recognizing their work. Furthermore, while there was some testimony that black students have not always been motivated by faculty to fulfill their potential, in recent years it appears that the school administrators and teachers have been dedicated to the belief that all children can learn and achieve.

Examining the school system as a whole, despite the tendency to have more minority staff in schools with a greater than average minority student population, the court does not believe the district's assignment policies serve to identify schools as intended for white or black students. The pattern identified by plaintiffs is not monolithic. The current percentages of minority staff in the district's schools are generally within ranges acceptable to other courts in desegregation litigation. Other facets of faculty and staff policies are nondiscriminatory. In sum, the record before the court with regard to the district's approach to faculty and staff is not indicative of a dual system of education.

### O. *Community Attitudes.*

Plaintiffs employed an opinion survey corporation to survey Topeka residents about their attitudes towards the schools in U.S.D. #501. Four hundred interviews were conducted by telephone from August 27, 1984 through September 1, 1984. The survey attempted to focus upon the opinions of adults who had or recently had children in the Topeka school system. One of the conclusions of the survey was that people in the community perceive some schools as "black" or "minority" schools and other schools as "white." The survey also found that the schools perceived by the respondents in the survey as "white" are also considered better than the schools perceived as "black" or "minority."

---

**15.** The minority staff percentage for all high schools and middle schools was 12.65%.

**16.** The ± 10% range was a remedial target approved by the court and the parties in *United States v. Texas Education Agency,* 679 F.2d 1104 (5th Cir.1982). See also *Board of Education v. Dowell,* 375 F.2d 158 (10th Cir.1967).

Defendants employed a public opinion researcher to critique the survey. Several well-founded objections were made.

The court does not believe the survey results are important to the ultimate issues in this case. At the outset, the court discounts the answers concerning the quality of education or quality of facilities at the schools. The survey's respondents were not education experts. They did not examine the entire school system before stating an opinion. Quite simply, in a case where the court is asked to compare school quality, the opinions of lay persons familiar with only one school or a few schools are not as helpful as the opinions of persons familiar with the entire system.

The questions concerning the racial identity or racial balance of schools seem more pertinent to issues in this case. The questions are related to a goal of desegregation —i.e., to achieve a system "without a 'white' school and a 'Negro' school, but just schools." *Green, supra*, 391 U.S. at 442, 88 S.Ct. at 1696. This goal, however, as represented in the survey questions, could be seen as utopian. The questions could be understood as asking whether people look past race in characterizing a school. While the world would be a better place if people did not see "race," that is not the constitutional standard which governs this case.

As discussed before (see footnote 7, *infra*), racial identity or racial balance are ambiguous terms. In the minds of the experts who testified in this trial, a school in Topeka with three white students to every minority student is a colorless or a racially balanced school. But, it is impossible to determine from the survey how Topeka residents characterize such schools because the survey respondents were not asked to characterize schools with that type of student ratio. They were only asked to characterize schools with much higher than average or much lower than average minority populations.

Furthermore, the responses to these questions were inconsistent. A majority of respondents familiar with Quinton Heights Elementary School and a plurality (49%) of the respondents familiar with Highland Park North Elementary School considered those schools to be racially balanced even though both schools had majority minority populations at the time of the survey. In contrast, a majority of respondents familiar with Belvoir Elementary School said it was a black school, although its minority percentage at the time was between that of Quinton Heights and Highland Park North. When respondents were asked if the district had black schools and, if so, to identify the schools, two schools relatively close to the district average for minority student population were most often listed as black schools—Highland Park High School and Topeka High School. Most respondents considered Eisenhower Middle School to be racially balanced, although it had the highest minority student percentage of secondary schools at the time of the survey. The only consistent thread to the survey is that schools with 90% white populations were often characterized as white schools. But, there were some exceptions to this rule. For instance, a plurality of respondents familiar with Gage Elementary School thought it was racially balanced even though its white population at the time was approximately ninety-two percent. Moreover, the school most often identified as "white," Topeka West High School, was within twenty percent of the average minority student population.

There were other problems with the survey. For instance, women were overrepresented in the survey. This could have affected the results since male and female answers tended to be different. Other segments of the population were left out or overrepresented. It is uncertain whether this may have altered the results. Finally, as defendants have noted, only a small percentage of respondents concurred with most of plaintiffs' racial characterizations of schools. For example, only fifteen percent of all the respondents listed Belvoir as a black school; seventy-five percent of the respondents had no opinion. For all the reasons previously listed, the court does not believe the survey of public opinion is strong evidence that segregation remains in U.S.D. # 501.

## P. *Equality of Education.*

A part of the trial was devoted to discussion of the harms of school segregation. Plaintiffs presented expert testimony describing the debate on the matter and the outcome of studies in the field. Defendants' experts presented a contrasting view, at least with regard to the effect of desegregation upon students' test scores. This court will postulate that school segregation is harmful because *de jure* segregation is unequivocally illegal.[17]

It should be reemphasized, however, that the issue at this juncture is not the harms of segregation, but whether intentional segregation or its vestiges remain in the district. Assuming that school segregation negatively affects test scores of minority students, then reasoning backwards (from effect to cause), evidence of inferior achievement by students in schools with high minority populations may be evidence of a vestige of segregation in the district.

Plaintiffs attempted to prove that a disparity in achievement existed by charting according to school, the sixth grade pass percentages on the Kansas Minimum Competency Tests in reading and math for 1985, and making the same comparison of results on the Iowa Test of Basic Skills for 1984–85. No attempt was made to control for any other factor that might influence achievement. In general, the charts show that classes in schools with low minority populations have higher pass percentages and higher scores on the Iowa Test of Basic Skills than classes in schools with average or higher than average minority populations.

Defendants presented a much more careful and comprehensive examination of the issue.[18] Scores on the Kansas Minimum Competency Tests were followed for the years 1980, 1982, 1983, 1985 and 1986. The results were categorized as to the schools' racial mixture: less than ten percent minority; between ten and forty percent minority; and over forty percent minority. Students' varying ability was controlled for with the use of scores on the Cognitive Abilities Test. Income level was controlled for by determining whether a student participated in a free or reduced lunch program. For the year 1986, information was gathered concerning other factors that might affect achievement. A questionnaire was completed by students to obtain information concerning many factors including: parents' education; parents' expectations and support; students' study and work habits; students' reading habits; and students' self-concept. A mobility analysis was also done to track the test scores of students who transferred from one building mixture to another. Approximately 13,000 reading test scores and 13,000 mathematics test scores were examined. Forty-six different analyses were completed.

The conclusion of the study was that the racial composition of schools in Topeka during the period in question did not significantly affect test scores in reading or mathematics. The study further found that movement of students to schools with different racial compositions did not affect proficiency levels. Finally, the study found that many other factors were much more important to achievement than the racial composition of a school.

Plaintiffs criticized defendants' study for improperly controlling for ability. The question was raised as to whether it is possible to control for ability. The court believes, however, that a reasonable and conscientious effort was made by defendants' expert to determine what effect, if any, the racial composition of the district's schools has upon student achievement. The study was characterized by an expert in the field, other than the author of the study, as "one of the most comprehensive,

---

17. In *Washington v. Seattle School District No. 1,* 458 U.S. 457, 472, 102 S.Ct. 3187, 3196, 73 L.Ed.2d 896 (1982), the Court stated: "[I]t should be ... clear that white as well as Negro children benefit from exposure to 'ethnic and racial diversity in the classroom.'" Quoting *Columbus Board of Education v. Penick, supra,* 443 U.S. at 486, 99 S.Ct. at 2991 (Powell, J., dissenting).

18. Ex. 1109, "An Analysis of Black Student Achievement in USD 501 Topeka, Kansas: 1980–1986" by Dr. John P. Poggio.

largest and most scientifically sound studies" that has been made on these issues. Tr. 2396. Although the results of the study are subject to the national debate which has endured for years on this issue, the most persuasive evidence *at this trial* indicates that the racial composition of the district's schools has an insignificant impact on student achievement. Thus, inferior achievement, as a vestige of segregation, has been eliminated.

### Q. *Opportunities for Desegregation.*

The failure to take desegregative action by a district that had an affirmative duty to desegregate should be carefully examined by the court. If a district has consistently dragged its feet on desegregation, then the vestiges of the segregated system may remain.

The Board of Education of Topeka's public schools did not implement a race-conscious student assignment plan following the Supreme Court decisions in this case. The law, as interpreted by this court upon the remand of this case, did not appear to require this action. Nevertheless, the closing of three formerly all-black schools, the enrollment of black students at formerly all-white neighborhood attendance centers, and the inclusion of white residences in the attendance area of the fourth formerly all-black elementary school, had noticeable desegregative results. One of plaintiffs' experts suggested a walk-in desegregation plan was feasible in 1955 and would have produced better results. Ironically, the current attendance zones for elementary schools in central Topeka are not radically different from the walk-in pattern suggested by plaintiffs' expert.

In 1968, with the *Green* decision, and three years later with the *Swann* decision, it became clear that a race-neutral neighborhood school system would not satisfy the legal duty to desegregate unless it effectively desegregated student attendance patterns. In 1974, the Department of Health, Education and Welfare (HEW) brought an administrative complaint against U.S.D. # 501 over the district's desegregation. The complaint was dismissed with the district's initiation of short-range and long-range proposals involving the closing of schools, construction of facilities and establishment of middle schools. Schools with the highest minority percentages were closed. Still, a few schools with majority minority student populations remained. During the time that action in response to the HEW suit was considered, the rough outlines of a plan to eliminate all majority/minority schools was developed at the request of the Board of Education. It was not pursued in favor of the long and short-range proposals which were more consistent with neighborhood schools, but still satisfied HEW.

Plaintiffs have asserted that one result of the district's desegregation effort in the 1970s was the completion of Quinton Heights' transformation into a racially identifiable school. Plaintiffs contrast Quinton Heights with the adjacent Stout School. Stout's minority population is approximately twenty percent less than Quinton Heights' minority enrollment. Still, Stout's minority percentage is very close to the district average. Thus, by plaintiffs' definition, it is not a "white" school bordering a "black" school. Moreover, the opportunity for further "desegregation" of these schools within the framework of smaller neighborhood schools is not apparent from the testimony or exhibits in this case.

In 1984, the Board of Education developed "Plans N and X" which represented a departure from the smaller neighborhood school system. Several goals and justifications unrelated to school desegregation were suggested for the plans. But, one of the plans' "assumptions" was that all majority minority schools would be eliminated.

Plan N required closing two middle schools and sixteen elementary schools. Two new elementary schools would be built, and one of the middle schools would be converted to an elementary school. The total construction cost of the proposal over a five-year period was estimated to be $13.2 million, although significant annual operating savings were projected.

Plan X required closing four middle schools and seventeen elementary schools.

One new middle school and one new elementary school would be built. Four middle schools would be converted to elementary schools. The cost of construction was estimated to be $15.4 million, although, again, significant operating savings were forecast.

Under Plans N and X, it was projected that no school's minority enrollment would exceed forty-five percent. In each plan, however, there would be two elementary schools with a white enrollment exceeding ninety-five percent, and at least four schools with white populations of approximately ninety percent or more.

The Board conducted public meetings in all parts of the district for comment upon the plans. Public reaction was uniformly and vigorously negative. No significant segment of the population supported the plans. Because of the hostile reaction to the plans, further consideration of the plans was dropped. No vote was ever taken upon them.

Public reaction to the plans indicated a desire to maintain smaller neighborhood schools. No evidence established that the opposition to Plans N and X, or the failure to implement the plans, was racially motivated.

The court does not believe the district's conduct over thirty years indicates a desire to perpetuate segregation by foregoing opportunities to desegregate schools. After the Supreme Court mandated that children be admitted to schools on a nondiscriminatory basis, the district completed efforts to apply a race-neutral neighborhood school attendance system to all students. This produced substantial integration. After the Supreme Court encouraged race-conscious efforts to eliminate the vestiges of segregation and HEW challenged the progress of desegregation in the district, additional action was taken to improve the racial balance of the student bodies in the district. In recent years, the Board of Education has demonstrated a sensitivity and commitment to maintain and improve integration within the district by drafting long-range proposals with racial mixing goals in mind. The district's efforts to desegregate have been helped by increased residential integration. The district has not bucked the demographic forces that have improved the racial balance of schools.

At any time, more could have been done to achieve racial balance in the schools. But, it begs the issue of this case to argue that racial balancing must be done today because it was not done yesterday. More should be done to improve racial balance in the schools if the existing imbalance follows from defendants' past intentional segregative conduct. The district's history of action or inaction toward racial conditions in the district does not suggest that the racial imbalance of the schools derives from the *de jure* system or a foot-dragging segregationist policy.

R. *Other Factors.*

Since 1976, members of the Board of Education of U.S.D. # 501 have been elected through a district system which improves the opportunities for minority membership on the Board. There have been minority members on the Board for several years serving in positions such as President of the Board, where vigorous and effective leadership has been displayed. The Board of Education currently has minority representation.

The district administers various events and programs to encourage interracial contact and ethnic awareness. One notable program is the Topeka Adventure Center. All fifth-grade students attend the Center for two weeks in groups of approximately 100. The groups are balanced by sex, race, geographic part of the city and socioeconomic level. The Center emphasizes student initiative, participation and cooperation in a variety of activities organized in a microcosmic, nonclassroom setting.

S. *Summary.*

In conclusion, after reviewing a multitude of factors which bear on the issue, the court is convinced that students in U.S.D. # 501 are admitted to school and educated on a nondiscriminatory basis. There is no illegal, intentional, systematic or residual separation of the races.

Plaintiffs appear to be arguing for a judicial fine-tuning of the desegregation process in U.S.D. #501. As compared with many desegregation cases, relatively small changes in student and staff assignment would create the balance which plaintiffs define as desegregation. Blind reliance upon statistical measures of balance, at least with regard to student assignment, was persuasively rejected by the Fifth Circuit in *Price.* Although plaintiffs assert other factors in corroboration of their thesis, a careful review of all relevant circumstances establishes that the *de jure* system of segregation has been dismantled and its vestiges eliminated.

The facilities, curriculum, progress of education, extracurricular activities and transportation offered by the district are not distinguishable on racial grounds.

Students of different races attend school together in significant numbers in every part of the district. School attendance is determined by a consistent application of neighborhood school principles. There is no gerrymandering. The race-neutral intent of these principles is untainted by past segregative practices. The court is persuaded that *de jure* segregation either had no significant effect upon residential patterns in Topeka or that its impact on residential patterns has attenuated to insignificance. Thus, the factors which bear on the racial condition of school attendance are the factors which affect residential choice —economic, social and geographic factors—not matters directed by defendants.

Racial balance does not exist in the district's schools. Some schools have a significantly greater minority student population than other schools. The schools with high or low minority percentages, however, are not the product of *de jure* segregation or covert intentional segregation. They are not isolated in neighborhoods with contrasting racial complexions. The schools with high minority populations have not been "minority" schools throughout their history. The schools with low minority populations are receiving increasing numbers of minority students. Demographic forces, uncontrolled by defendants, form the racial composition of the schools.

Disparities also exist in the numbers of minority faculty and staff at schools in U.S.D. #501. These disparities, however, are neither so large, nor so consistent that they identify schools as racially segregated.

Regardless of the merits of racial balance, the imbalance perceived in this case is neither unconstitutional *per se,* nor unconstitutional in conjunction with other factors such as community attitudes, test scores, faculty and staff assignment or opportunities for improvement. The record reflects that defendants did not cause the present imbalance by engaging in or perpetuating the vestiges of illegal race-conscious conduct. An examination of the school system as a whole reveals an integrated system free of the characteristics of *de jure* segregation.

## X. *Title VI.*

Plaintiffs have premised their action in part upon Title VI of the Civil Rights Act of 1964. This statute prohibits racial discrimination in programs receiving federal financial assistance. The school district receives federal financial assistance—some of which is applied generally and some of which is earmarked for specific programs. Therefore, Title VI applies to the district.

Title VI, however, only reaches intentional discrimination, unless agency regulations promulgated pursuant to Title VI provide otherwise. *Alexander v. Choate,* 469 U.S. 287, 293, 105 S.Ct. 712, 717, 83 L.Ed.2d 661 (1985). The record does not establish that defendants intentionally discriminate against plaintiffs or that a policy of intentional discrimination has had effects continuing to the present. Nor has a proper case for relief under federal regulations been proven. Plaintiffs have asserted that the district violated 34 C.F.R. § 100.3(b)(2). But, the district's student and staff assignment criteria do not have the effect of discriminating against students because of their race or of impairing the education of minority students. Therefore, relief under Title VI is not warranted.

## XI. *The State Board of Education.*

Plaintiffs have alleged that the State Board of Education (SBE) is responsible for

the racial conditions within U.S.D. #501, more for what SBE has *not* done than for what SBE has done. When this case was filed, SBE did not exist. The State had a Superintendent of Public Instruction, but this officer did not have general supervisory powers over local public schools. The State's involvement in this case was limited to defending the constitutionality of the statute which permitted, but did not command, segregation in grades K–6 in Topeka's schools. After this defense failed, the statute was repealed. In 1966, Article 6 of the Kansas Constitution was amended. This amendment provided for the creation of SBE which would supervise elementary and secondary education. The Constitution expressly reserved control of public schools to locally elected school boards, however. See *State ex rel. Miller v. Board of Education,* 212 Kan. 482, 511 P.2d 705 (1973).

 This is an official capacity action. The individual members of SBE are being sued in their official capacity for injunctive relief. To prevail in such a suit, plaintiffs must demonstrate that SBE is a "moving force" behind the illegal segregation which they allege. *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 3106, 87 L.Ed.2d 114 (1985). It must be established that SBE's policy or custom played a part in the presence of illegal segregation within U.S.D. #501. *Id.* In *Rizzo v. Goode,* 423 U.S. 362, 377, 96 S.Ct. 598, 607, 46 L.Ed.2d 561 (1976), the Court reversed an injunctive decree involving police conduct in Philadelphia, distinguishing two school desegregation cases (*Brown* and *Swann*) on the grounds that the defendants in *Rizzo* were not shown to have deprived others of their constitutional rights by their *own* conduct.

In this case, plaintiffs have attempted to establish liability of the members of SBE by showing that SBE failed to police the desegregation process in U.S.D. #501 and failed to provide assistance, guidance and impetus for desegregation. The court finds that SBE *has* been inactive in this area. But, plaintiffs have failed to demonstrate that the policy or custom of SBE is a root cause or moving force behind the racial conditions which currently exist in the district. There has been no showing that the conduct of SBE has deprived plaintiffs of their constitutional rights. The responsibility for student and staff assignment as well as for the equalization of educational opportunity within the district rests with the local school board. The State has repealed the legislation authorizing segregation. Legislation prohibiting discrimination has been enacted. Any residue of segregation traceable to the repealed statute has been eradicated in the court's opinion. For these reasons, the court believes SBE is not responsible for the racial conditions present in the district.

## XII. *Conclusion.*

U.S.D. #501 provides a high-quality educational opportunity to its students on a nondiscriminatory basis. There is no significant or consistent disparity in the faculty and staff, facilities, transportation or extracurricular activities available to students. Students are assigned to schools on a race-neutral basis. The district's neighborhood school approach has achieved a high level of integration, but not racial balance by any measure. The racially imbalanced schools are not the product of overt or covert intentional segregative conduct. The court is convinced after reviewing a multitude of factors that the vestiges of past segregation in the district have been dissolved by time, demographic change and the district's steady course of race-neutral and integrative action. This case has reached an appropriate denouement. The district has a unitary system of education.[19]

Accordingly, plaintiffs' claims for relief are denied.

IT IS SO ORDERED.

---

**19.** Under *Dowell v. Board of Education,* 795 F.2d 1516 (10th Cir.1986), the original order to desegregate remains effective.