978 F.2d 585
 61 USLW 2279, 78 Ed. Law Rep. 292
 Oliver BROWN, et al., Plaintiffs,
and
Charles Smith and Kimberly Smith, Minor Children, by their
Mother and Next Friend, Linda Brown Smith, et al.,
Intervening Plaintiffs/Appellants,
v.
BOARD OF EDUCATION OF TOPEKA, SHAWNEE COUNTY, KANSAS, et
al., Defendants-Appellees.
 No. 87-1668.
 United States Court of Appeals,
Tenth Circuit.
 Oct. 27, 1992.
Rehearing Denied Jan. 28, 1993.
 
 Christopher A. Hansen (Richard Jones, Charles Scott, Jr., and Joseph Johnson with him, on the brief), American Civil Liberties Union Foundation, for plaintiffs-appellants.
 Dan Biles, of Gates & Clyde, Overland Park, Kan., Carl Gallagher, Asst. Atty. Gen., Topeka, Kan., and K. Gary Sebelius (Anne L. Baker and Charles N. Henson with him, on the brief) of Davis, Wright, Unrein, Hummer, and McAllister, Topeka, Kan., for defendants-appellees.
 Before MCKAY, SEYMOUR, and BALDOCK, Circuit Judges.
 SEYMOUR, Circuit Judge.
 
 
 1
 More than three years ago, we reversed the district court's decision in this landmark school desegregation case. Brown v. Board of Educ., 892 F.2d 851 (10th Cir.1989). The Supreme Court recently vacated our lengthy opinion, Board of Educ. v. Brown, --- U.S. ----, 112 S.Ct. 1657, 118 L.Ed.2d 381 (1992), remanding for further consideration in light of Board of Educ. v. Dowell, 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991), and Freeman v. Pitts, --- U.S. ----, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). After oral argument and due consideration of Dowell and Freeman, we reinstate our prior opinion in full, with the additions set out below.[1]
 
 I.
 
 2
 On remand we are required to determine whether recent Supreme Court authority has altered the landscape of desegregation law so as to change our prior opinion. We reversed the district court in part because it "erred in placing the burden on plaintiffs to prove intentional discriminatory conduct rather than according plaintiffs the presumption that current disparities are causally related to past intentional conduct."[2] Brown, 892 F.2d at 854. In its opinion, the district court wrote that, "after 30 years, one cannot assume that the racial imbalance which remains is a vestige of the de jure system or other illegal segregation." Brown v. Board of Educ., 671 F.Supp. 1290, 1297 (D.Kan.1987). In Freeman, the Supreme Court said simply: "The school district bears the burden of showing that any current [racial] imbalance is not traceable, in a proximate way, to the prior violation." --- U.S. at ----, 112 S.Ct. at 1447 (emphasis added). See also Lee v. Etowah County Bd. of Educ., 963 F.2d 1416, 1425 (11th Cir.1992). Freeman thus explicitly reaffirms one of the principles that required our reversal of the district court. The Court further held that a court may relinquish supervisory control over a former de jure school system in an incremental manner, Freeman, --- U.S. at ----, 112 S.Ct. at 1445.
 
 
 3
 Dowell underscored the equitable nature of the desegregation decree, and indicated that the term "unitary" has no magical import. 498 U.S. at ---- - ----, 111 S.Ct. at 635-36. Our prior opinion does not treat unitariness as a rigid concept; it instead insists that a school district seeking freedom from continued judicial oversight must prove that any current racial imbalance is not connected to the prior de jure system. Dowell does not mark a retreat from the principle that "[t]he measure of any desegregation plan is its effectiveness." Davis v. School Comm'rs, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971); see also Freeman, --- U.S. at ----, 112 S.Ct. at 1446. We previously applied this test in assessing the district court's unitariness[3] finding under the clearly erroneous standard. Brown, 892 F.2d at 868.
 
 
 4
 The Supreme Court's cases charge school boards that once operated school systems segregated by law "with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." Green v. County School Bd., 391 U.S. 430, 437-38, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). After an initial finding of liability, the district court may enforce this duty "without any new proof of a constitutional violation." Freeman, --- U.S. at ----, 112 S.Ct. at 1456 (Blackmun, J. concurring). Here, the question is not whether plaintiffs successfully established in the 1986 trial that the school system operated in a manner inconsistent with the constitutional guarantee of equal protection; that question was answered in 1955. Instead, as we made clear in our initial opinion, the question is whether Topeka has successfully discharged the duty imposed by the Constitution to eliminate the vestiges of de jure segregation.
 
 
 5
 Both Dowell and Freeman address the means by which a school system may be discharged from the active supervision of the courts. In Dowell, the Court required the district court to consider "whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable."[4] Dowell, 498 U.S. at ----, 111 S.Ct. at 638; Freeman, --- U.S. at ---- - ----, 112 S.Ct. at 1449-50. Dowell reaffirmed Green's requirement that a court considering whether the vestiges of past segregation have been eliminated must look to "every facet of school operations." 498 U.S. at ----, 111 S.Ct. at 638 (quoting Green, 391 U.S. at 435, 88 S.Ct. at 1692).
 
 
 6
 Freeman expanded on this requirement by explicitly stating that "[a] federal court in a school desegregation case has the discretion to order an incremental or partial withdrawal of its supervision and control," --- U.S. at ---- - ----, 112 S.Ct. at 1444-45, thereby allowing a school system to achieve compliance in one facet of its operations before it has fulfilled the whole of its affirmative duty. Neither Dowell nor Freeman suggests that the plaintiffs in the remedial phase of school desegregation litigation must make a new showing of discriminatory intent in order to obtain relief from a current condition of segregation. The district court here wrongly required the plaintiffs to make such a showing. See Brown, 671 F.Supp. at 1295 ("Plaintiffs have the burden of proving that illegal segregation exists in U.S.D. # 501.").
 
 
 7
 "Proper resolution of any desegregation case turns on a careful assessment of its facts." Freeman, --- U.S. at ----, 112 S.Ct. at 1437. The facts underlying this case are far different than those before the Supreme Court in either Dowell or Freeman. In Oklahoma City, the school board adopted a comprehensive plan to desegregate the school system in 1972 and operated under that plan for many years. See Dowell v. Board of Educ., 890 F.2d 1483, 1486-87 (10th Cir.1989), rev'd, 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991). In DeKalb County, the district court had approved a plan to achieve maximum practicable desegregation. Freeman, --- U.S. at ----, 112 S.Ct. at 1447. Subsequent to the implementation of the plan, demographic changes resulted in largely segregated residential neighborhoods. At the same time, the population of DeKalb County increased dramatically. See id. --- U.S. at ----, 112 S.Ct. at 1438-40. In the face of these changes, the school system aggressively employed a Minority-to-Majority transfer program and several magnet school programs in an effort to maintain some level of racial balance in student assignment. Id. --- U.S. at ----, 112 S.Ct. at 1440. In Topeka, in contrast, the school board did very little to desegregate its student assignment practices.[5] See Brown, 892 F.2d at 874. Fortunately, increasing residential integration actually helped to decrease racial segregation in some of the city's neighborhood schools. Unlike DeKalb County, the best that can be said of Topeka's efforts is this: "The district has not bucked the demographic forces that have improved the racial balance of schools." Brown, 671 F.Supp. at 1309 (emphasis added).[6]
 
 
 8
 "Our post-Green cases provide that, once state-enforced school segregation is shown to have existed in a jurisdiction in 1954, there arises a presumption, ... that any current racial imbalance is the product of that violation." Freeman, --- U.S. ----, 112 S.Ct. at 1453 (Scalia, J. concurring); see United States v. Fordice, --- U.S. ----, ----, 112 S.Ct. 2727, 2735, 120 L.Ed.2d 575 (1992). This is the presumption that the district court failed to accord plaintiffs in this case. See Brown, 892 F.2d at 867-68. At the time of trial, the Topeka school system operated a number of racially identifiable schools. See id. at 870. In the continuing remedial phase of this litigation, then, the district court must impose upon defendants the substantial burden of demonstrating the absence of a causal connection between any current condition of segregation and the prior de jure system. Until the school district meets this burden, the district court must retain some measure of supervision over the school system.[7]
 
 
 9
 In this case, the district court disregarded Topeka's history of inaction, observing: "At any time, more could have been done to achieve racial balance in the schools. But, it begs the issue of this case to argue that racial balancing must be done today because it was not done yesterday." Brown, 671 F.Supp. at 1309. To expect the lingering effects of legally mandated separation to magically dissolve with as little effort as the Topeka school district exerted, see Brown 892 F.2d at 874, is to expect too much. "[S]tubborn facts of history linger and persist," Freeman, --- U.S. at ----, 112 S.Ct. at 1448, and, if left unattended, they fester. The Constitution does not permit the courts to ignore today's reality because it is temporally distant from the initial finding that the school system was operated in violation of the constitutional rights of its students. Temporal distance matters only to the extent that changes across that time period, unconnected to the de jure system's lingering effects, are responsible for what is observable today. See Freeman, --- U.S. at ----, 112 S.Ct. at 1448 ("fundamental changes ... not attributable to the former de jure regime" responsible for currently segregated schools).
 
 
 10
 The district court's conclusion that the Topeka system had achieved unitary status depended on its belief that the "district's conduct over thirty years [did not] indicate[ ] a desire to perpetuate segregation." 671 F.Supp. at 1309; see id. at 1311 ("The racially imbalanced schools are not the product of overt or covert intentional segregative conduct."). This belief does not adequately support the court's decision. The absence of affirmatively discriminatory action or intent across time is insufficient, without more, to demonstrate the lack of a causal connection between the prior de jure system and the present system. It is far easier to demonstrate an absence of segregative intent than it is to rebut the presumed causal connection between current conditions and legally mandated segregation.[8] See Freeman, --- U.S. at ----, 112 S.Ct. at 1453 (Scalia, J. concurring) (presumed connection is powerful).
 
 
 11
 The lesson of Freeman is not that demographic changes in a district absolve a school board of its affirmative duty to desegregate. Instead, the case teaches that demographic change may produce racially identifiable schools in a district that has fulfilled its affirmative duty. What matters is whether current racial identifiability is a vestige of a school system's de jure past, or only a product of demographic changes outside the school district's control. If the current condition is a vestige then the school system has not fulfilled its affirmative duty. "If the State has not discharged this duty, it remains in violation of the Fourteenth Amendment." Fordice, --- U.S. at ----, 112 S.Ct. at 2735.
 
 
 12
 We have little reason to doubt defendant's repeated insistence that its various decisions were not motivated by racial animus. Indeed, the innovative character of the school system by the time of trial suggests a genuine commitment to providing quality education to all its students. See Brown, 892 F.2d at 889. The district court thought such a showing sufficient. As a matter of law, it was not. See Dayton Board of Educ. v. Brinkman, 443 U.S. 526, 538, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979) ("As was clearly established in [prior cases], the Board had to do more than abandon its prior discriminatory purpose."); Harris v. Crenshaw County Bd. of Educ., 968 F.2d 1090, 1095 (11th Cir., 1992) ("[S]chool officials are obligated not only to avoid any official action that has the effect of perpetuating or reestablishing a dual school system, but also to render decisions that further desegregation and help to eliminate the effects of the previous dual school system."). The school system failed to demonstrate that the current racial identifiability of its schools is not connected to its prior practice of segregation. See Brown, 892 F.2d at 877. Nothing in Freeman or Dowell compels us to alter that conclusion.
 
 II.
 
 13
 In shaping a remedy on remand the district court should, in accordance with Freeman's incremental approach, consider whether it would be appropriate to relinquish supervision of those areas of the school system plaintiffs conceded were unitary. See Brown, 892 F.2d at 869 n. 53 ("Topeka school system is unitary with respect to facilities, extracurricular activities, curriculum, transportation, and equality of education."). In so doing, the district court must assess
 
 
 14
 whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system; and whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good faith commitment to the whole of the court's decree and to those provisions of the law and the constitution that were the predicate for judicial intervention in the first instance.
 
 
 15
 Freeman, --- U.S. ----, 112 S.Ct. at 1446 (emphasis added). Freeman thus requires the district court to make two findings before withdrawing its supervision incrementally. First, the court must find that the relinquishment of control over the facet at issue would not make it impossible to craft a remedy that will achieve compliance in the system's other facets. Next, the court must find that the school system has demonstrated good faith. This second inquiry is not limited to an individual facet. Instead, the court must consider the system's efforts to desegregate, as a whole, across time. Id.
 
 
 16
 In its initial opinion, the district court did not evaluate the school system's good faith. On remand, it must make such a finding and its evaluation must be based on objective criteria. See id. Mere protestations of an intention to comply with the Constitution in the future will not suffice. Instead, specific policies, decisions, and courses of action that extend into the future must be examined to assess the school system's good faith. Id.
 
 
 17
 In its brief, after the Supreme Court remanded this case to us, the school district argued that:
 
 
 18
 If Plaintiffs prevail in this case and a court-ordered remedy is implemented, the danger is that in Topeka, as in Oklahoma City and DeKalb County, the remedy will not have more than a temporary effect upon student attendance figures. Depending upon the nature of the remedy, white flight from the racially balanced schools may occur, as well as community resentment over court interference and the expenditure of resources for noncurricular purposes. Under the teaching of Dowell, after the Topeka school district would have complied with such a plan in good faith for a number of years, court jurisdiction could then be withdrawn. It is highly probable that the neighborhood schools at the time of withdrawal would be more imbalanced than they are today. Why should Topeka schools be burdened for no long-term benefit?
 
 
 19
 Brief of Appellee at 36 (citation omitted) (emphasis added). It is difficult to understand how the district can contend that compliance with the Constitution does not confer a long-term benefit upon the students in Topeka. At the same time, the district's argument highlights a potential problem with Dowell. Depending on the definition of "good faith," the possibility of immediate resegregation following a declaration of unitariness seems all too real. For this reason, we are convinced that evaluation of the "good faith" prong of the Dowell test must include consideration of a school system's continued commitment to integration. A school system that views compliance with a school desegregation plan as a means by which to return to student assignment practices that produce numerous racially identifiable schools cannot be said to be acting in "good faith." See Dowell, 498 U.S. ----, 111 S.Ct. at 637 (prior to discharge, district court must find "that it was unlikely that the school board would return to its former ways.").
 
 
 20
 In order to show good faith, for purposes of either incremental or final discharge from ongoing court supervision, Topeka must demonstrate that "its policies form a consistent pattern of lawful conduct directed to eliminating earlier violations." Freeman, --- U.S. at ----, 112 S.Ct. at 1446. The inquiry into Topeka's good faith, like the inquiry into whether further remedial efforts are necessary, must consider whether Topeka has taken such affirmative steps in the direction of desegregation so as to establish a "consistent pattern of lawful conduct." A comprehensive plan, adopted and followed by the school board, aimed at eliminating the vestiges of segregation to the system would be evidence of good faith; so might a school board resolution declaring the school board's intention to comply with the Constitution in the future, see Lee v. Talladega County Bd. of Educ., 963 F.2d 1426, 1428 (11th Cir.1992), but only if coupled with affirmative efforts across time. As we have observed above, inaction in the face of the affirmative duty to desegregate is not lawful conduct. A school system that does not take the required steps cannot be found in good faith and may not be discharged from continued supervision with respect to any facet of its operations.
 
 
 21
 The decision of a court to relinquish supervisory control over one or more facets of the school system is not tantamount to an abandonment of jurisdiction. Therefore, if it were later to appear that a vestige of segregation in a facet still under the court's control has led to a reemergence of segregation in a facet over which the court had relinquished control, the court would not be powerless to react. "[B]ecause the court retains jurisdiction over the case, it should of course reassert control over [the relinquished area] if it finds that this does happen." Freeman, --- U.S. at ----, 112 S.Ct. at 1455 (Souter, J. concurring). In such an event, because the reemergence would be linked to a vestige of the past system, it would itself be a vestige. Consequently, no showing of discriminatory intent would be needed to enable the court to address the problem.
 
 
 22
 With respect to the areas of student assignment and faculty/staff assignment, which were not unitary when the trial was held in this case, the district court must consider the current situation in Topeka schools in order to fashion an appropriate remedy. Six years have passed since the trial, and it is likely that many changes have occurred in the school system. The district court should inquire into the recent history of Topeka's efforts to fulfill its affirmative duty, and should assess the effects of those efforts on student and faculty staff assignments. It must shape a remedy that addresses the remaining vestiges of segregation in the Topeka school system, and that promises to eliminate them to the extent practicable. See Dowell, 498 U.S. ----, 111 S.Ct. at 638.
 
 III.
 
 23
 We are mindful of the limited authority and ability of the courts to reshape society, but we possess an abiding respect for the constitutional guarantee of equal protection and the responsibility of the courts to insure that government fulfills its promise to all its citizens. The law that required reversal of this case in 1989 has not been changed by Freeman or Dowell. The opinion we reinstate today is consistent with these most recent Supreme Court pronouncements in the area of school desegregation. We say simply that because Topeka has not fulfilled its affirmative duty in the areas of student and faculty/staff assignments, the district court erred in concluding that the system as a whole had achieved unitary status. The district court must instead formulate an appropriate remedy.
 
 
 24
 Accordingly, we again REVERSE the decision of the district court, and we REINSTATE our prior opinion.
 
 
 25
 BALDOCK, Circuit Judge, dissenting.
 
 
 26
 Nothing so needs reforming as other people's habits.
 
 
 27
 --Pudd'nhead Wilson's Calendar
 
 
 28
 Mark Twain, Pudd'nhead Wilson ch. XV.
 
 
 29
 The Supreme Court vacated this court's judgment in Brown v. Board of Educ., 892 F.2d 851 (10th Cir.1989), and remanded for reconsideration in light of its two most recent pronouncements in the field of public school desegregation, Board of Educ. v. Dowell, 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991), and Freeman v. Pitts, --- U.S. ----, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). See Board of Educ. v. Brown, --- U.S. ----, 112 S.Ct. 1657, 118 L.Ed.2d 381 (1992). The vacation of the judgment and remand were apt because both Supreme Court cases address "the duties of a district court during the final phases of a desegregation case...." See Freeman, --- U.S. at ----, 112 S.Ct. at 1446.
 
 
 30
 Parsing those decisions for the minimal support they provide its prior resolution, this court again reverses the district court's judgment and reinstates its prior opinion "in full." Court's Opinion at 588, 593. This court again finds the Topeka system not unitary and requires another desegregation plan, at least in the areas of student and faculty/staff assignment, notwithstanding that the Supreme Court has announced important new principles concerning the later phases of school desegregation.
 
 
 31
 Dowell and Freeman reaffirmed that federal court involvement in school desegregation was always meant to be temporary, confined to remedying a constitutional violation and restoring control to state and local authorities. Freeman, --- U.S. ----, 112 S.Ct. at 1445; Dowell, 498 U.S. at ----, 111 S.Ct. at 636; Lee v. Talladega County Bd. of Educ., 963 F.2d 1426, 1430 (11th Cir.1992). Thus, a federal court may withdraw from supervision of a school district in increments as the district achieves unitary status over each facet of its operations. Freeman, --- U.S. at ----, 112 S.Ct. at 1445. Once a school district has achieved unitary status, actions concerning student assignment, even if they result in racial imbalance, must be evaluated under traditional equal protection principles which require a showing of intentional discrimination. Dowell, 498 U.S. at ----, 111 S.Ct. at 638; United States v. Overton, 834 F.2d 1171, 1175-76 (5th Cir.1987). See also Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 22-23, 91 S.Ct. 1267, 1279-1280, 28 L.Ed.2d 554 (1971) (discussing the use of school desegregation cases for purposes beyond their scope). To read this court's latest opinion, one would be hard pressed to divine that the school officials prevailed in both Dowell and Freeman, and the Supreme Court reversed the lower appellate courts as going too far.
 
 
 32
 This court remains convinced that the district court incorrectly (1) required the plaintiffs to prove discriminatory intent, (2) did not accord the plaintiffs the presumption that racially imbalanced schools are attributable to the de jure system, and (3) did not insist on a sufficient showing by the defendant school district to prove compliance with its affirmative duty. Court's Opinion at 589-91. For several reasons explained previously, I disagree that the district court incorrectly applied the presumption and burden shifting principles involved in a school desegregation case.[1] See Brown, 892 F.2d at 889 (Baldock, J., dissenting). The district court recognized that Topeka had an affirmative duty to eliminate the vestiges of segregation and apparently concluded that the school board had overcome the presumption against it inherent in racially imbalanced schools. See Brown v. Board of Educ., 671 F.Supp. 1290, 1292-93, 1295 (D.Kan.1987). See also Lee v. Etowah County Bd. of Educ., 963 F.2d 1416 (11th Cir.1992). As conceded at oral argument, however, the district court's short discussion of the burden of proof is not free from ambiguity. See Brown, 671 F.Supp. at 1295.
 
 
 33
 This case should be remanded to the district court for complete reconsideration. We could then be assured of the district court's application of the correct presumption and burden shifting principles and have the advantage of the district court making the myriad of required factual findings. More importantly, the district court can incorporate into its analysis the Supreme Court's recent guidance concerning the role of good faith and demographic change in the later phases of school desegregation.
 
 
 34
 Given the sharply differing views of the experts in this case, this court should reconsider its insistence on trying the case on appeal. In both Dowell and Freeman, the Supreme Court acknowledged the importance of a district court's evaluation of the evidence, including expert testimony,[2] in deciding whether a school district has complied with the Constitution. See Dowell, 498 U.S. at ----, 111 S.Ct. at 638 (remanding to the district court to decide "whether the Board made a sufficient showing of constitutional compliance"); Freeman, --- U.S. at ----, 112 S.Ct. at 1440 (concerning whether DCSS had met its affirmative duty, "[p]etitioners and respondents presented conflicting expert testimony about the potential effects that desegregative techniques not deployed might have had upon the racial mix of the schools. The District Court found that the petitioner's experts were more reliable...."); id. --- U.S. at ----, 112 S.Ct. at 1439 (in deciding that DeKalb County School System ["DCSS"] was unitary as to student assignment in 1969 despite the presence of two majority-minority schools, district court relied on "expert witness testimony that Terry Mill [school] had become a majority black school as a result of demographic shifts unrelated to the actions of petitioners or their predecessors"). The record in this case is filled with conflicting evidence concerning the unitary status inquiry demanded by Dowell: "whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable." 498 U.S. at ----, 111 S.Ct. at 638 (footnote omitted). See also Etowah County, 963 F.2d at 1424 n. 9 (Dowell provides standard for unitariness inquiry).
 
 
 35
 This court's decision that Topeka did not comply with its affirmative duty and did not prove that racial imbalance was not attributable to de jure segregation is tantamount to directing a verdict in favor of the plaintiffs. But this is not a case where the evidence "is so one-sided that one party must prevail as a matter of law." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986) (discussing directed verdict standard); Etowah County, 963 F.2d at 1425 (district court improperly granted summary judgment given "a genuine issue of material fact as to the defendant's attainment of unitary status"). The massive record in this case contains evidence concerning student and faculty/staff assignment[3] which could support either side. See Brown, 892 F.2d at 890, 911-13 (Baldock, J., dissenting). We should rely "on the informed judgment of the district court[ ] in the first instance." See Swann, 402 U.S. at 28, 91 S.Ct. at 1282.
 
 
 36
 Although this court recognizes, as it must given the clear language of Dowell and the concession of the plaintiffs at oral argument, that the district court must consider "whether the Board had complied in good faith with the desegregation decree since it was entered," 498 U.S. at ----, 111 S.Ct. at 638, this court then limits the good faith inquiry to events subsequent to 1986 by apparently deciding as a matter of law that Topeka cannot demonstrate good faith before 1986.[4] See Court's Opinion at 592. In evaluating good faith compliance, the district court may consider that "with the passage of time the degree to which racial imbalances continue to represent vestiges of a constitutional violation may diminish...." Freeman, --- U.S. at ----, 112 S.Ct. at 1446. Deciding these highly factual points as a matter of law is perfectly consistent with this court's prior appellate factfinding and strong reluctance to return this case to the district court to revisit events prior to 1986.
 
 
 37
 This court's remand of the case for formulation of another desegregation plan may be a costly and unnecessary exercise in social engineering given the demographic characteristics which the district court determined were now responsible for student assignment patterns.[5] The Supreme Court recognized that the mobility of American society and the private residential choices of Americans frequently contribute to racial imbalance. Freeman, --- U.S. at ----, 112 S.Ct. at 1448. See also Flax v. Potts, 915 F.2d 155, 161-62 (5th Cir.1990). The Court held that a school district is not required to racially balance student assignments "in the late phases of carrying out a decree, when the imbalance is attributable neither to the prior de jure system nor to a later violation by the school district but rather to independent demographic forces." Freeman, --- U.S. at ----, 112 S.Ct. at 1447.
 
 
 38
 In reaching this holding, the Supreme Court apparently relied on the following facts:
 
 
 39
 In the case before us the District Court designed a comprehensive plan for desegregation of DCSS in 1969, one that included racial balance in student assignments. The desegregation decree was designed to achieve maximum practicable desegregation. Its central remedy was the closing of black schools and the reassignment of pupils to neighborhood schools, with attendance zones that achieved racial balance. The plan accomplished its objective in the first year of operation, before dramatic demographic changes altered residential patterns. For the entire 17-year period the respondents raised no substantial objection to the basic student assignment system....
 
 
 40
 Id. Although the Court indicated that the plan achieved racial balance, the plaintiffs introduced evidence that 5.6% of the student population was black in 1969, yet two elementary schools had majority-minority student assignment (76% and 51% black). Id. --- U.S. at ----, 112 S.Ct. at 1439. As noted, the district court "found the racial imbalance in these schools was not a vestige of the prior de jure system." Id.
 
 
 41
 Here, the district court concluded that demographic forces are responsible for the racial composition in Topeka's schools. Brown, 671 F.Supp. at 1310. This court claims that such a conclusion "is in considerable tension with the district court's observations that demographics have had a desegregative influence on student assignment in Topeka's schools." Court's Opinion at 590 n. 6 (citing Brown, 892 F.2d at 874). The district court, however, appears to have made that observation primarily in the context of increased minority enrollment in schools which have had high concentrations of white enrollment. See Brown, 671 F.Supp. at 1300. The district court did attribute higher than average minority enrollment in many schools to demographic factors, unrelated to school board action. See id. at 1301-03. This court also discounts the demographic element given "the school district's failure to ever operate without racially identifiable schools, and the district court's failure to apply the appropriate legal standard...." Court's Opinion at 590 n. 6. This statement rests on this court's overinclusive definition of racial identifiability, see Brown, 892 F.2d at 911-912 (Baldock, J., dissenting); Lee v. Macon County Board of Educ., 970 F.2d 767, 774 n. 23 (11th Cir.1992) (noting that a school which is 64% black is not racially identifiable; a school which is 94% black is), and liability in the absence of racial balance, regardless of the showing made by the school district which has the substantial, but not insurmountable, "burden of showing that any current imbalance is not traceable, in a proximate way, to the prior violation."[6] See Freeman, --- U.S. at ----, 112 S.Ct. at 1447 (emphasis added). I would require the district court to reconsider the demographic variable on remand. Use of current data is essential.[7]
 
 
 42
 This court attempts to distinguish Dowell and Freeman from Brown on the basis that school authorities in Oklahoma City and DeKalb County conducted aggressive desegregation efforts, but that Topeka did "very little" and the best that can be said is that Topeka did not resist demographic changes which improved racial balance. First, Topeka has successfully implemented two desegregation plans. See Brown, 892 F.2d at 895-98, 904-08 (Baldock, J. dissenting). Second, Topeka has no one-race minority or virtually one-race minority schools; only three schools were majority-minority in 1985-86; Belvoir (61.86% minority), Highland Park North (57.93%) and Lafayette (56.81%).[8] See id. at 936-37 n. 43, 939 n. 45, 939-40 n. 46.
 
 
 43
 There are remarkable similarities between Freeman and the facts of this case, but Topeka has far less racial imbalance than DCSS[9] and probably has done at least as much as DCSS (and over a longer period of time) to encourage racial balance. Of obvious concern to the plaintiffs in Freeman were the following facts: (1) in a system in which forty-seven percent of the students were black, fifty percent of the black students attended schools which were 90+% black, (2) five out of twenty-two high schools were 90% + black, and (3) eighteen of seventy-four elementary schools were 90% + black. Topeka has no 90% + black schools, although it does have three elementary schools which have a slight majority of minority students. Approximately twenty-five percent of the black elementary students attend these three schools.
 
 
 44
 Notwithstanding the understandable concerns of the Freeman plaintiffs concerning racial balance, the Supreme Court necessarily determined that DCSS had satisfied its affirmative duty to desegregate as to student assignment after the first year of a 1969 plan which closed black schools and reassigned students to neighborhood schools, with attendance zones that achieved racial balance.[10] --- U.S. at ----, 112 S.Ct. at 1447. Topeka also employed a neighborhood plan. In Freeman, the district court determined that two majority-minority schools in 1969 were not vestige schools. --- U.S. at ----, 112 S.Ct. at 1439. Here, the district court determined that the three majority-minority schools were not vestige schools. Brown, 671 F.Supp. at 1301-03. In Freeman, the plaintiffs did not raise their complaint about the student assignment system for seventeen years after enactment of the plan, --- U.S. at ----, 112 S.Ct. at 1447; Brown was dormant for twenty-four years, 671 F.Supp. at 1291-92.
 
 
 45
 Even at this late stage in the desegregation litigation (thirty-seven years after Brown I, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)), the school board is obligated to remedy racial imbalance, but only if it is a vestige of the de jure system. Freeman, --- U.S. at ----, 112 S.Ct. at 1447. We cannot lose sight that "[t]he mix that would have occurred but for the racism is a judicially created hypothetical." Overton, 834 F.2d at 1176. After thirty-seven years, the school district must be allowed to focus on the promise of a public school education to develop the potential in every child, notwithstanding declining enrollments, limited governmental resources and social problems. Our Constitution does not elevate punitive over practical considerations. See Harris v. Crenshaw County Bd. of Educ., 968 F.2d 1090, 1096-97 (11th Cir.1992); Overton, 834 F.2d at 1177.
 
 
 46
 Once a school district has demonstrated that it has operated free of the taint of intentional segregation, control must devolve to local authorities. Withholding unitary status until perfect racial balancing occurs cannot guarantee tolerance, remedy ignorance or obliterate prejudice. Rather, it serves to distance the patrons of the school district from school officials by permanently displacing state and local authority guaranteed by the Constitution. It also minimizes the arduous gains in racial equality and reneges on the promise of eventual autonomy made to a school district which has operated in good faith. Imposing a remedy on Topeka in the manner adopted by this court, when the district court legitimately could find otherwise were it allowed to exercise its traditional factfinding power, betrays "the sense of basic fairness inherent in equity," especially important in this sensitive area. See Swann, 402 U.S. at 31, S.Ct. at 12. Because I believe that the case should be remanded for reconsideration of all issues by the district court in light of the directly relevant and new authority commended to us by the Supreme Court, I respectfully dissent.
 
 
 
 [1]
 We do not address the district court's Title VI holding, its dismissal of the Governor of the State of Kansas, or its ruling that the State Board of Education bears no liability for segregation in Topeka's schools. Each of these issues is resolved by our prior opinion
 
 
 [2]
 After a review of the record, we also held clearly erroneous the district court's findings that the school system had reached unitary status in student assignment and faculty and staff assignment practices
 
 
 [3]
 The term "unitary" describes a school system or a facet of a school system that has been brought into compliance with the constitution. See Board of Educ. v. Dowell, 498 U.S. 237, ----, 111 S.Ct. 630, 636, 112 L.Ed.2d 715 (1991)
 
 
 [4]
 Any tension perceived by the school board between this standard and our requirement that the school system must "eliminate[ ] all traces of past intentional segregation to the maximum feasible extent," Brown v. Board of Educ., 892 F.2d 851, 859 (10th Cir.1989), is more imagined than real. Indeed, a leading dictionary defines "practicable" as "feasible." See Webster's Third New International Dictionary at 1780 (1981). The same dictionary defines "vestige" as "a remaining bit that constitutes a memorial or trace." Id. at 2547
 
 
 [5]
 The same is true with regard to faculty/staff assignment practices. "In Topeka, ... there is a clear pattern of assigning minority faculty/staff in a manner that reflects minority student assignment." Brown, 892 F.2d at 872. This pattern may itself reinforce racial identifiability, and if left unattended "will act as an incubator for resegregation in other[ ]" facets of the school system. Freeman v. Pitts, --- U.S. ----, ----, 112 S.Ct. 1430, 1455, 118 L.Ed.2d 108 (1992) (Souter, J. concurring). Nothing in the recent Supreme Court cases alters our holding with regard to faculty/staff assignments. We reiterate that a failure to achieve compliance with regard to faculty/staff assignment is particularly disturbing because it is the one facet within the exclusive control of the local school authorities
 
 
 [6]
 The district court's decision in Freeman rested in part on its holding that the DeKalb County schools were successfully desegregated in student assignment in 1969. Freeman, --- U.S. at ----, 112 S.Ct. at 1439. Subsequent resegregation, the district court held, was caused by demographic changes unconnected to the prior de jure system. Id. --- U.S. at ----, 112 S.Ct. at 1438-40. In the present case, the district court did state: "Demographic forces, uncontrolled by defendants, form the racial composition of the schools." Brown v. Board of Educ., 671 F.Supp. 1290, 1310 (D.Kan.1987). This comment, however, is in considerable tension with the district court's observations that demographics have had a desegregative influence on student assignment in Topeka's schools. See Brown, 892 F.2d at 874. Moreover, in light of the school district's failure to ever operate without racially identifiable schools, and the district court's failure to apply the appropriate legal standard, the court's conclusion that demographics caused segregation simply does not amount to a supportable holding that the current condition of segregation in Topeka is wholly unconnected to the prior de jure school system. The absence of a moment at which Topeka achieved compliance with the Constitution is vital because it is only "[o]nce the racial imbalance due to the de jure violation has been remedied [that] the school district is under no duty to remedy imbalance that is caused by demographic factors." Freeman, --- U.S. at ----, 112 S.Ct. at 1447 (emphasis added)
 
 
 [7]
 This supervision does not amount to the imposition of federal jurisdiction in perpetuity. "[F]ederal supervision of local school systems was intended as a temporary measure to remedy past discrimination." Dowell, 498 U.S. at ----, 111 S.Ct. at 637. We simply insist that the school board accomplish the required "transition to a system of public education freed of racial discrimination," id. (quoting Brown v. Board of Educ., 349 U.S. 294, 299-301, 75 S.Ct. 753, 755-57, 99 L.Ed. 1083 (1955)), prior to the relinquishment of federal court jurisdiction
 
 
 [8]
 Indeed, several of the school district's actions across time had directly segregative effects. See Brown, 892 F.2d at 874-77
 
 
 [1]
 The district court's observation that the passage of time and demographic changes "detract from the justification," Brown v. Board of Educ., 671 F.Supp. 1290, 1295 (D.Kan.1987), for the presumption that racial imbalance is attributable to the school board is similar to Justice Scalia's observation in Freeman: "At some time, we must acknowledge that it has become absurd to assume, without any further proof, that violations of the Constitution dating from the days when Lyndon Johnson was President, or earlier, continue to have an appreciable effect upon current operation of schools." --- U.S. at ----, 112 S.Ct. at 1453 (Scalia, J., concurring). Be that as it may, the district court indicated that, regardless of the presumption, the "defendants have proven by a preponderance of the evidence that U.S.D. # 501 is a unitary school system." Brown, 671 F.Supp. at 1295 (emphasis added)
 
 
 [2]
 In its prior opinion holding the district court's unitariness finding "clearly erroneous," this court claimed that it did not rely on expert opinion, but rather uncontroverted evidence concerning the racial composition of the various schools and what the school district did or did not do to meet its affirmative duty. Brown, 892 F.2d at 868 n. 50. See also id. at 911-913 (Baldock, J., dissenting). The Supreme Court is fully aware of the importance of expert testimony in school desegregation cases. This case is no different. The conflicting expert testimony in this case should be considered by the trier of fact
 
 
 [3]
 The data on faculty/staff assignment is particularly well-suited for district court findings. See Brown, 892 F.2d at 927-935 (discussing problems with this court's factual findings)
 
 
 [4]
 Identifying a "potential problem with Dowell," this court determines that to demonstrate "good faith," before incremental withdrawal of federal control will be allowed, a school system must demonstrate its "continued commitment to integration." Court's Opinion at 592. This requirement could make the withdrawal of federal court supervision more apparent than real if it requires the promise of affirmative conduct on the part of the school board once a district becomes unitary. Good faith compliance with a desegregation decree "over a reasonable period of time" is relevant because it is "evidence that any current racial imbalance is not the product of a new de jure violation, and enables the district court to accept the school board's representation that it has accepted the principle of racial equality and will not suffer intentional discrimination in the future." Freeman, --- U.S. at ----, 112 S.Ct. at 1449-50 (emphasis added and citation omitted). Although this court is anxious to deal with "the possibility of immediate resegregation following a declaration of unitariness," Court's Opinion at 592, that question is not before us. This court's forward cast to the definition of good faith appears to be from the same bolt of cloth as Dowell v. Board of Educ., 890 F.2d 1483, 1490 (10th Cir.1989) ("For this reason, the court's jurisdiction extends beyond the termination of the wrongdoing ... because an injunction seeks to stabilize a factual setting with a judicial ordering and maintain that condition which the order sought to create.") (citation omitted), rev'd, 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991)
 
 
 [5]
 The district court found that de jure system was not responsible for residential choice which resulted in racially imbalanced schools. Brown, 671 F.Supp. 1290. See also Freeman, --- U.S. at ----, 112 S.Ct. at 1454 (Souter, J., concurring) (school segregation may cause residential segregation)
 
 
 [6]
 The similarity between Justice Blackmun's opinion concurring in the judgment in Freeman, --- U.S. at ----, 112 S.Ct. at 1457-60, and this court's opinion in Brown, 892 F.2d 851, is all too obvious. Justice Blackmun thought it imperative that the district court reexamine its conclusion that DCSS had met its affirmative duty and was unitary with respect to student assignment. Freeman, --- U.S. at ----, 112 S.Ct. at 1460. He was of the view that, analyzed under the correct legal principles, DCSS could not prove that its past segregative acts were not responsible for current (and pronounced) racial imbalance. A majority of the Court, however, did not join in that approach. We should not follow it here
 
 
 [7]
 As Judge Selya recently observed in another context:
 One implication of the recent Supreme Court school desegregation decisions is that federal courts, at least in the minerun of civil rights and institutional reform cases, have no choice but to make decisions about the maintenance, modification, or dissolution of structural remedial orders by referring to the most current population statistics readily available. After all, knowledge of demographic shifts is essential for determining whether patterns of minority representation in state institutions and organizations reflect state action, which has constitutional implications, or private preferences, which, generally, do not. See, e.g., Freeman v. Pitts, --- U.S. ----, ---- - ----, ---- - ----, 112 S.Ct. 1430, 1437-38, 1447-48, 118 L.Ed.2d 108 (1992)
 Mackin v. City of Boston, 969 F.2d 1273, 1276-77 (1st Cir.1992).
 
 
 [8]
 Belvoir and Highland Park North were annexed to the Topeka district in 1959 with substantial majorities of white students; Lafayette was an all white de jure school in 1954. See Brown, 892 F.2d at 936, 938-39 (Baldock, J., dissenting). The district court in Freeman relied on similar facts in concluding that two majority black schools were not vestige schools in 1969. --- U.S. at ----, 112 S.Ct. at 1439
 
 
 [9]
 Topeka also has far less racial imbalance than that created in Oklahoma City under a 1984 student reassignment plan. The plan resulted in eleven out of sixty-four elementary schools becoming 90% + black as to student assignment. Dowell, 498 U.S. at ----, 111 S.Ct. at 634
 
 
 [10]
 The court of appeals had flatly rejected the district court's decision that DCSS had no further responsibility concerning student assignment:
 The plaintiffs argue that DCSS never achieved a constitutionally-sufficient level of desegregation. The plaintiffs argue that until the DCSS achieves unitary status, it must affirmatively move toward the maximum practical level of desegregation. The plaintiffs also argue that demographic shifts do not excuse the DCSS's resegregation.
 The DCSS argues that it fulfilled its duties in the area of student assignment when it closed all de jure black schools following the district court's 1969 order. The DCSS argues that the district court properly refused to find it responsible for segregation caused by demographic changes.
 We hold that a school system that has not achieved unitary status must take affirmative steps to gain and maintain a desegregated student population. The DCSS may not shirk its constitutional duties by pointing to demographic shifts occurring prior to unitary status. Accordingly, we reverse the district court's conclusion that DCSS fulfilled its constitutional obligations in the area of student assignment.
 ....
 Student segregation, prior to achieving unitary status, indicates that vestiges remain. Therefore, the DCSS must continue to work toward desegregation until it removes all vestiges. The fact that the DCSS achieved racial parity in the area of student assignment on the day it closed the de jure black schools does not demonstrate that it fulfilled its duties to achieve maximum possible desegregation and to avoid the reestablishment of a dual system.
 Pitts v. Freeman, 887 F.2d 1438, 1448-49 (11th Cir.1989) (footnote omitted), rev'd, --- U.S. ----, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992).